UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                               :     **ORAL ARGUMENT**

| | | |
|---|---|---|
| In re: | : | **ORAL ARGUMENT** |
| | : | **REQUESTED** |
| | : | |
| DELTA AIR LINES, INC., et al., | : | Chapter 11 |
| | : | Case No. 05-17923 (ASH) |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| BELL ATLANTIC TRICON LEASING | : | |
| CORPORATION, NCC GOLF COMPANY, NCC | : | |
| KEY COMPANY and NCC CHARLIE | : | 08 Civ. 2449 (RMB) |
| COMPANY, | : | |
| | : | |
| Appellants, | : | |
| | : | |
| - against - | : | |
| | : | |
| DELTA AIR LINES, INC., et al., | : | |
| | : | |
| Appellees. | : | |

-------------------------------------------------------------x

## <u>APPELLANTS' OPENING BRIEF ON APPEAL</u>

Hunton & Williams LLP
Peter S. Partee
Scott H. Bernstein
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000 (telephone)

-and-

Benjamin C. Ackerly
Jason W. Harbour
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200 (telephone)

*Attorneys for Bell Atlantic Tricon Leasing
Corporation, NCC Golf Company, NCC Key Company
and NCC Charlie Company*

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ............................................................1

II.    STATEMENT OF BASIS OF APPELLATE JURISDICTION..........................................3

III.   STANDARD OF APPELLATE REVIEW..........................................3

IV.    STATEMENT OF ISSUES PRESENTED ON APPEAL....................................3

V.     STATEMENT OF THE CASE..........................................5

      A.     Nature of the Case..........................................5

      B.     Course of the Proceedings and Disposition Below...........................6

      C.     Statement of the Facts..........................................7

            1.     The Verizon OP Claims ..........................................7

            2.     TIAs and Aircraft Leveraged Lease Transactions .......................7

VI.    ARGUMENT..........................................11

      A.     The Bankruptcy Court Violated Controlling Second Circuit Precedent..........................................11

            1.     The Bankruptcy Court Erred by Not Considering Parol Evidence Regarding the Ambiguity of the Exclusions.............12

            2.     The Bankruptcy Court's Citation to Dictionary Definitions Does Not Support the Conclusion that the Exclusion Provisions Are Unambiguous ..........................................13

            3.     The Only Evidence in the Record Contradicts the Bankruptcy Court's Interpretation of the Exclusions ...............13

      B.     The Bankruptcy Court Violated Controlling Supreme Court Precedent..........................................15

            1.     The Bankruptcy Court Improperly Relied on Selective Dictionary Definitions ..........................................16

            2.     The Bankruptcy Court Improperly Conflated Claim Allowance and Claim Discharge ..........................................19

            3.     The Bankruptcy Court Improperly Interpreted the TIAs.............20

C.     The Bankruptcy Court Violated Controlling New York Contract Law ........................................................................................... 23

      1.     Stipulated Loss Value Is a Specific Defined Amount .............................. 23

      2.     All Payments Must Be Made in Immediately Available Funds ......................................................................................... 24

      3.     The Meaning of the Exclusion Provisions Did Not Change As a Result of Delta's Bankruptcy ............................................................. 24

VII.     CONCLUSION ................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Aetna Casualty & Sur. Co. v. Namrod Development Corp.*,
  140 B.R. 56 (S.D.N.Y. 1992) ................................................................................20

*Alexander & Alexander Servcs., Inc. v. Lloyd's*,
  136 F.3d 82 (2d Cir. 1998) ..................................................................................13

*Astroline Communications Co., Ltd. Partnership v. Astroline Co.*,
  1996 U.S. App. LEXIS 24940 (2d Cir. Sept. 13, 1996) .......................................3

*Butner v. United States*,
  99 S. Ct. 914 (1979) .......................................................................................1, 15

*In re Chateaugay Corp.*,
  116 B.R. 887 (Bankr. S.D.N.Y. 1990) ................................................................13

*In re Delta Air Lines, Inc.*,
  370 B.R. 552 (Bankr. S.D.N.Y. 2007) ..................................................................2

*Finance One Publ. Co. Ltd. v. Lehman Brothers Special Finance, Inc.*,
  414 F.3d 325 (2d Cir. 2005) .................................................................................3

*Garza v. Marine Trans. Lines, Inc.*,
  861 F.2d 23 (2d Cir 1988) ...................................................................................13

*General Foods Credit Corp. v. United Air Lines, Inc. (In re UAL Corp.)*,
  2007 U.S. Dist. LEXIS 5422 (N.D. Ill. Jan. 22, 2007) ........................................2

*International Multifoods Corp. v. Commercial Union Insurance Co.*,
  309 F.3d 76 (2d Cir. 2002) ..................................................................................12

*In re Kmart Corp.*,
  362 B.R. 361 (Bankr. N.D. Ill. 2007), *aff'd Philip Morris Capital  Corp. v.
  Kmart Corp.*, 2007 U.S. Dist. LEXIS 79531 (N.D. Ill. Oct. 24, 2007) ...............2

*Levine v. Ribicoff*,
  201 F. Supp. 692 (S.D.N.Y. 1992) ......................................................................19

*Lewis v. Manufacturers National Bank*,
  81 S. Ct. 347 (1961) ............................................................................................15

*P.G. Lake, Inc. v. Commissioner*,
    148 F.2d 898 (5th Cir. 1945) ................................................................19

*Parks Real Estate Purchasing Group v. St Paul Fire and Marine Insurance Co.*,
    472 F.3d 33 (2d Cir. 2006)...................................................................13

*Sayers v. Rochester Telegraph Corp. Supplemental Management Pension Plan*,
    7 F.3d 1091 (2d Cir. 1993) (emphasis added) ...................................12

*Scotto v. Brink's, Inc.*,
    962 F.2d 225 (2d Cir. 1992)..................................................................19

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000)..............................................................2, 23

*This is Me, Inc. v. Taylor*,
    157 F.3d 139 (2d Cir. 1998)..................................................................23

*Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*,
    127 S. Ct. 1199 (2007)......................................................................1, 16

*World Trade Ctr. Properties, L.L.C. v. Hartford Fire Insurance Co.*,
    345 F.3d 154 (2d Cir. 2003), *overruled in part on other grounds by*
    *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006)...................1, 12

## STATE CASES

*Burr v. Commercial Travelers Mutual Acc. Association of America*,
    67 N.E.2d 248 (N.Y. 1946)..................................................................18

*IBM Credit Financing Corp. v. Mazda Motor Manufacturing (USA) Corp.*,
    647 N.Y.S.2d 322 (N.Y. Sup. Ct. 1996) .............................................18

*RM 14 FK Corp. v. Bank One Trust Co., N.A.*,
    831 N.Y.S.2d 120 (N.Y. App. Div. 2007) ..........................................21

*Westmoreland Coal Co. v. Entech, Inc.*,
    100 N.Y.2d 352 (N.Y. 2003) ...............................................................23

## DOCKETED CASES

*In re National Energy & Gas Transmission (f/k/a PG&E National Energy Group,
    Inc.)*, Case No. 03-30459PM (Bankr. D. Md. Nov. 10, 2005)............3

## FEDERAL STATUTES

28 U.S.C. § 158(a)(l)....................................................................................................3

## MISCELLANEOUS

ball. Dictionary.com. *Dictionary.com Unabridged (v 1.1)*. Random House, Inc.
    http://dictionary.reference.com/browse/ball (accessed: March 20, 2008).........................17

*Webster's Third New International Dictionary of the English Language,*
    *Unabridged* 1659 (Merriam-Webster, Inc. 1986)..............................................................17

# I.    PRELIMINARY STATEMENT

This appeal (the "Appeal") seeks reversal of the February 7, 2008 Order of the United States Bankruptcy Court (the "Bankruptcy Court") (No. 35)[1] (the "Disallowance Order") disallowing and expunging certain claims (the "Verizon OP Claims") filed by Bell Atlantic Tricon Leasing Corporation, NCC Golf Company, NCC Key Company, and NCC Charlie Company (collectively, the "Verizon OPs" or the "Verizon Owner Participants"), in the chapter 11 bankruptcy cases of Delta Air Lines, Inc. and its affiliates (collectively, "Delta" or the "Debtors").  The Bankruptcy Court set forth its reasoning in a January 16, 2008 decision (No. 34) ("Decision").  Reversal is warranted for at least three reasons.

First, the Bankruptcy Court violated the controlling Second Circuit precedent of *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 186 (2d Cir. 2003), *overruled in part on other grounds by Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006), which *requires* courts to consider extrinsic evidence of the customs, practices, usages and terminology of a particular industry to determine whether a contract is ambiguous.  Instead of following controlling Second Circuit precedent, the Bankruptcy Court refused to allow discovery or consider extrinsic evidence of the customs, practices, usages and terminology of the aircraft leveraged lease industry.

Second, the Bankruptcy Court violated the controlling Supreme Court precedents of *Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co.*, 127 S. Ct. 1199 (2007) ("*Travelers*") and *Butner v. United States*, 99 S.Ct. 914 (1979) ("*Butner*"), which *require* that the interpretation of a contract in bankruptcy *must* be the same as the interpretation of the contract outside of bankruptcy.  Instead of following controlling Supreme Court precedents, the Bankruptcy Court

---

[1]    Items designated as the record on appeal by the Appellants are referred to herein as "No. _".

adopted a bankruptcy-specific interpretation of the contracts at issue and disallowed the Verizon OP Claims based on that interpretation, even though the non-bankruptcy interpretation of the contracts would have mandated the allowance of the Verizon OP Claims in their entirety.

Third, the Bankruptcy Court violated black letter New York contract law which prohibits courts from re-writing parties' agreements and requires courts to interpret contracts as a whole, giving meanings to all provisions in related contracts. *See, e.g., Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000). Instead of following controlling New York contract law, the Bankruptcy Court re-wrote the parties' contracts and ignored critical provisions in related contracts, including express definitions.

Moreover, the *Decision*, along with *In re Delta Air Lines, Inc.*, 370 B.R. 552, 562-63 (Bankr. S.D.N.Y. 2007) (No. 9) ("*Delta I*"; together with the *Decision*, the "*Delta* Opinions"), are landmark decisions that represent a fundamental break from the positions taken in multiple air line bankruptcies over the past three decades in which claims based on tax indemnity agreements ("Tax Indemnity Agreements" or "TIAs") consistently have been allowed in negotiated or filed amounts despite the existence of similar exclusion provisions in the operative documents governing such claims. Specifically, the *Delta* Opinions, which were reached without discovery or evidentiary hearings, represent the first decisions to disallow TIA claims based on Delta's self-serving interpretation of the TIAs' exclusion provisions. In fact, the United States District Court for the Northern District of Illinois recently ruled on calculation issues involving TIA claims without addressing the application of the exclusion provision initially raised, but subsequently dropped, by the debtors in that case. *See General Foods Credit Corp. v. United Air Lines, Inc. (In re UAL Corp.)*, 2007 U.S. Dist. LEXIS 5422 (N.D. Ill. Jan. 22, 2007); *see also In re Kmart Corp.*, 362 B.R. 361 (Bankr. N.D. Ill. 2007), *aff'd Philip Morris Capital*

*Corp. v. Kmart Corp.*, 2007 U.S. Dist. LEXIS 79531 (N.D. Ill. Oct. 24, 2007) (addressing calculation of allowed TIA claims); *In re National Energy & Gas Transmission (f/k/a PG&E National Energy Group, Inc.)*, Case No. 03-30459PM, slip op. (Bankr. D. Md. Nov. 10, 2005) (addressing calculation of allowed TIA claims).

The Verizon OPs respectfully request that this Court (i) reverse the Disallowance Order and direct the Bankruptcy Court to enter an order allowing the Verizon OP Claims as to liability, and remand for determination of their proper amounts, or (ii) alternatively, remand for further evidentiary proceedings and direct the Bankruptcy Court to permit the Verizon OPs to take discovery and to consider extrinsic evidence.

## II.    STATEMENT OF BASIS OF APPELLATE JURISDICTION

This is an Appeal from an order of the Bankruptcy Court over which this Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(l).

## III.    STANDARD OF APPELLATE REVIEW

This Appeal involves solely questions of contract interpretation which, as matters of law, are subject to *de novo* review by this Court.  *See Fin. One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 339 (2d Cir. 2005) ("We review contract interpretation *de novo*."); *Astroline Communications Co., Ltd. P'ship v. Astroline Co.*, 1996 U.S. App. LEXIS 24940, at *5 (2d Cir. Sept. 13, 1996) ("In assessing a bankruptcy court's interpretation of a contract, we review its textual interpretation *de novo* . . . .").

## IV.    STATEMENT OF ISSUES PRESENTED ON APPEAL

A.    Whether the Bankruptcy Court erred as a matter of law in preventing the Verizon OPs from taking any discovery whatsoever with respect to the meaning and function of the exclusion provisions of the Tax Indemnity Agreements.

B.    Whether the Bankruptcy Court erred as a matter of law in holding that the exclusion provision of the Tax Indemnity Agreements is unambiguous and in declining to consider the uncontroverted extrinsic evidence presented by the Verizon OPs with respect to the meaning of the exclusion provisions of the Tax Indemnity Agreements.

C.    Whether the Bankruptcy Court erred as a matter of law in refusing to consider any extrinsic evidence as to the customs and usages of terms in the leveraged aircraft lease industry in determining that the exclusion provisions of the Tax Indemnity Agreements are unambiguous.

D.    Whether the Bankruptcy Court erred as a matter of law in reaching its conclusions as to (i) the interest and objective of Delta in negotiating the Tax Indemnity Agreements; and (ii) the expectation and contemplation of the parties who drafted the Tax Indemnity Agreements, without admitting or considering any evidence to support these conclusions.

E.    Whether the Bankruptcy Court erred as a matter of law in holding that the Tax Indemnity Agreements can be interpreted differently in the "bankruptcy context" than they would be if interpreted in accordance with applicable state law and its rules of contract interpretation.

F.    Whether the Bankruptcy Court erred as a matter of law in disallowing the Verizon OP Claims and in incorrectly applying the exclusion provision, including without limitation by holding that  the allowance of, and distributions on, the Indenture Trustee's claims in accordance with Delta's confirmed plan constitutes the "payment" of the required amount  within the meaning of the exclusion provision of the Tax Indemnity Agreements.

G.    Whether the Bankruptcy Court erred as a matter of law in holding that Delta could satisfy the elements of the exclusion provisions in the Tax Indemnity Agreements by tendering payment in kind (*i.e.* shares of stock) of an amount that was not calculated in compliance with

the provisions of the Tax Indemnity Agreements and the related transaction documents, instead of paying the full amount of Stipulated Loss Value (as defined in the relevant documents) in United States Dollars as required by the applicable contract terms.

## V.    STATEMENT OF THE CASE

### A.    Nature of the Case

This Appeal focuses on the interpretation of the "exclusion provisions" of the TIAs related to the Verizon OP Claims.  The exclusion provisions at issue provide that no TIA payments are required if "a party to any of the Operative Documents is required to pay Stipulated Loss Value or Termination Value, *to the extent such amounts have been paid*."  (emphasis added).[1]  Exclusion provisions operate as a contractual waiver of TIA claims in a very specific and narrow set of circumstances, e.g., circumstances in which a lessee pays the numerical dollar amount defined as "Stipulated Loss Value" in the operative documents ("Stipulated Loss Value" or "SLV") upon the occurrence of certain termination events.  This set of circumstances is most likely to occur when the aircraft lessee is not in bankruptcy (e.g., a casualty loss occurs, lessee is required to pay SLV and lessor receives insurance proceeds that are at least equal to the full amount of SLV), but theoretically could occur in bankruptcy as well.  Regardless of which context triggers the exclusion, however, the meaning is the same:  If the lessee is required to and does pay SLV in cash in full, then the owner participant agrees to waive its TIA claim; otherwise, the exclusion provision is not operative.  Delta disagrees with this interpretation and

---

[1]    The language at issue from the exclusion provisions of the TIAs related to the Verizon OP Claims is identified in Exhibit 2 to the *Response of Bell Atlantic Tricon Leasing Corporation, NCC Golf Company, NCC Key Company and NCC Charlie Company to Substitute TIA/SLV Objection 3: Objection by Delta Air Lines, Inc. to Certain Claims Asserted by of Bell Atlantic Tricon Leasing Corporation, NCC Golf Company, NCC Key Company and NCC Charlie Company and the Bank of New York for Tax Indemnities and Stipulated Loss Values* (No. 25) ("Verizon OP Response").

instead maintains that the allowance of a bankruptcy claim in a negotiated amount that is *far* less than SLV and that will be satisfied by a distribution of stock that has a value significantly less than SLV, is sufficient to cause the exclusions in the TIAs to apply.

**B.    Course of the Proceedings and Disposition Below**

Due to the large number of leveraged lease TIA claims filed against Delta, Delta and the Official Committee of Unsecured Creditors initiated a "test case" process under which they grouped claims together according to similar exclusion language in the TIAs.

On August 19, 2007, the Verizon OPs filed the *Motion of the Verizon Owner Participants to Intervene as a Party to Debtors' TIA/SLV Objection* (No. 19) (the "Motion to Intervene").  At the hearing on the Motion to Intervene on September 5, 2007, Delta agreed that they would file *Substitute TIA/SLV Objection 3: Objection by Delta Air Lines, Inc. to Certain Claims Asserted by Bell Atlantic Tricon Leasing Corporation, NCC Golf Company, NCC Key Company, NCC Charlie Company and the Bank of New York for Tax Indemnities and Stipulated Loss Values* (No. 23) ("TIA/SLV Objection 3") to name certain of the Verizon OPs' TIA claims as the substitute test case 3, thereby mooting the Motion to Intervene.  The Bankruptcy Court then conducted a status conference on TIA/SLV Objection 3 and prohibited the Verizon OPs from conducting discovery, *without ever having seen the relevant operative documents* to determine whether the exclusion provisions in TIA/SLV Objection 3 are unambiguous.  *See* Transcript of September 5, 2007 Hearing (No. 22), at 84-87.

On September 14, 2007, Delta filed TIA/SLV Objection 3.  On October 15, 2007, the Verizon OPs filed the Verizon OP Response.  On November 2, 2007, Delta filed the *Reply Memorandum of Delta Air Lines, Inc.: Substitute TIA/SLV Objection 3* (No. 28).  On November 13, 2007, the Bankruptcy Court held a hearing regarding, *inter alia*, TIA/SLV Objection 3.  On

January 16, 2008, the Bankruptcy Court issued the *Decision*, and on February 7, 2008, the Bankruptcy Court entered the Disallowance Order.

### C.    Statement of the Facts

#### 1.    The Verizon OP Claims

The Verizon OPs are the owner participants with respect to the leveraged lease transactions involving the aircrafts bearing the tail numbers identified on Exhibit 1 to the Verizon OP Response.  The Verizon OP Claims, totaling $80,599,599.72, are identified on Exhibit 1 to the Verizon OP Response and are incorporated herein by reference.  The calculation of and basis for each of the Verizon OP Claims is identified and discussed in Exhibit A to each of the Verizon OP Claims.  The Verizon OP Claims assert TIA claims and general indemnity claims against Delta.

Delta's obligation to indemnify the Verizon OPs under the TIAs and the participation agreements ("Participation Agreements") was triggered by Delta's continuing defaults under its lease of the aircraft (collectively, the "Lease Agreements"; together with the TIAs, the Participation Agreements and the related transactional documents, the "Operative Documents"), including without limitation, the filing of Delta's voluntary petition for relief under chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") on September 14, 2005.

#### 2.    TIAs and Aircraft Leveraged Lease Transactions

Airline leveraged lease transactions comprise a highly specialized industry.  They are fundamentally three-party transactions among an owner participant, a lender, and an airline.  In a typical transaction, (i) an "owner trust" purchases an aircraft and leases it to an airline, (ii) the owner trust finances its purchase of the aircraft with an equity investment from the "owner participant," which is the beneficiary of the owner trust, for an amount equal to at least 20% of the acquisition cost of the aircraft, (iii) the owner trust borrows the remaining portion of the

acquisition cost of the aircraft from a group of lenders,[2] and (iv) the owner trust pledges the aircraft lease and certain rental payments, and grants a lien on the aircraft itself, to an indenture trustee as collateral security for the owner trust's debt to the lenders. The owner participant is the owner of the aircraft and is entitled to the tax benefits associated with ownership.

As a result of the leveraged lease structure, owner participants, mainly through the available tax benefits, are able to offer more favorable financing terms than those that would be available under a loan. Because owner participants provide reduced rental payments to the lessee by sharing a portion of their tax benefits related to owning the aircraft, owner participants require that airlines enter into TIAs to protect them against loss of such "passed through tax benefits." Under the TIAs, airlines indemnify owner participants for damages stemming from specifically negotiated actions or from failures by the airline to perform its obligations.

TIAs in aircraft leveraged lease transactions serve to protect owner participants against tax and other exposure arising as a result of a variety of actions or omissions of the lessee as specified in the TIAs. One of the specific acts that triggers a TIA claim is the lessee's early termination of the lease. In that context, TIAs function as "backstops" or "safety nets" to ensure that owner participants obtain compensation for their increased tax liabilities and lost economic benefits when the primary mechanism for obtaining that compensation--the "waterfall" that results from full payment in cash of SLV--fails. None of the related lenders' SLV claims equal the full amount of SLV as defined in the Operative Documents, and such claims are not being paid in full or in cash, leaving the TIA claims as the only remaining means by which the Verizon OPs can obtain any funds with which to pay the additional tax liabilities arising as a result of the lessee's early termination of the leases or any compensation for the loss of their substantial

---

[2]    The debt portion of the acquisition cost of the aircraft also my be financed through the issuance of "enhanced equipment trust certificates" (a/k/a "<u>EETC</u>") or other securities.

investments in these transactions.  In fact, it does not appear that any of the lenders' SLV claims are even being allowed in the specific dollar amount that constitutes SLV under the TIAs.  For the avoidance of doubt, SLV is a defined term which means the precise dollar amount that is derived from applying the formula in the applicable Exhibit to the Operative Documents.  Any other dollar amount, including the dollar amounts of the allowed "SLV" claims which have been agreed upon between the lenders and Delta, is not SLV as that term is used in the TIAs.

If affirmed, the Bankruptcy Court's holdings would deprive owner participants of this fundamental "backstop" and "safety net" in the one context in which owner participants need it the most: rejection of the lease in a lessee bankruptcy.  Owner participants specifically negotiated for the protections afforded by the TIAs and relied heavily on those protections in providing economically beneficial pricing to Delta.  Absent the protection of having a direct claim against the lessee for tax and other exposure triggered by the lessee's rejection of the lease, the owner participants would not have entered into the transactions on the same terms.  Similarly, the lessees benefit from reduced debt rates from the lenders as a result of the owner participants' assignment of all rent, including SLV, because lenders factor over-collateralization into their pricing, and the *lessees understand that they obtain these upfront favorable economic terms by providing two separate and independent rights under the operative documents*: *SLV claims to the lenders and TIA claims to the owner participants*.

Owner participants specifically negotiate for and obtain TIAs for the very purpose of ensuring that if as a result of some action by the lessee of the aircraft, they have increased tax or other exposure, the owner participants can obtain compensation for that increased exposure directly from the lessee through the TIAs--a claim in which the lenders have no interest and over which the lenders have no control.  Owner participants only agree to waive this claim in

instances in which the lessee fully performs its obligations under the lease and ***pays*** SLV. All of the parties to an aircraft leveraged lease transaction understand and expect that the TIAs will operate in precisely this manner and in precisely these contexts, regardless of whether and to what extent the lenders enforce their SLV claims against the lessee.

The intended functioning of the TIAs is corroborated by the exclusion provisions, which describe the limited circumstances under which the parties specifically have agreed that no payment is due under the TIAs. One type of exclusion that is present in virtually every TIA provides that if the owner participant gets what it bargained for out of the "SLV waterfall" because SLV has been paid, then no TIA payment is due. This type of exclusion takes various linguistic forms, but each is intended to achieve the same goal.

The exclusion provisions contained in the TIAs that are the subject of the Verizon OP Claims provide that no TIA payments are required if "a party to any of the Operative Documents is required to pay Stipulated Loss Value or Termination Value, to the extent such amounts have been paid." The exclusion provisions use the defined term "Stipulated Loss Value" to describe the amount that must be paid to trigger the exclusion. The Operative Documents define Stipulated Loss Value as the precise dollar amount derived from applying the formula provided on a Schedule attached to the underlying Lease Agreement. A dollar amount negotiated between the lenders and the Debtors as an allowed "SLV" claim that is not the ***precise*** dollar amount that constitutes Stipulated Loss Value under the Operative Documents is not "Stipulated Loss Value" as that term is used in the exclusion provisions. As a result, the allowance of, and distribution on, a claim in any other amount does not constitute payment of (or even allowance of and distribution on) Stipulated Loss Value, and therefore could not trigger the exclusion.

Moreover, the Lease Agreements and the TIAs require all payments by Delta be made in U.S. dollars in immediately available funds.  Thus, the Operative Documents clearly provide that unless SLV is paid in U.S. dollars in immediately available funds, the exclusion provisions do not apply, and the Verizon OPs are entitled to allowed TIA claims payable in accordance with the terms of Delta's Plan.

The exclusion provisions use the word "paid" to describe the events that can trigger the exclusion and eliminate the TIA claim because it is only actual payment in cash in full of SLV that renders the TIA claim unnecessary.  Only actual payment in cash in full of SLV will cause the owner participants to receive a sufficient level of recompense for their tax and other exposure through the SLV "waterfall" and, thus, only actual payment in cash in full of SLV renders the "back stop" or "safety net" provided by the TIA unnecessary.

## VI.    ARGUMENT

### A.    The Bankruptcy Court Violated Controlling Second Circuit Precedent

The language used in the exclusion provisions has a particular, specialized meaning in the aircraft leveraged lease industry.  Aircraft leveraged lease transactions are framed in unique terminology, memorialized in a largely standardized set of documents, and negotiated based on an economic logic that makes them critically different from a typical loan or lease.  Without a full and complete understanding of the specialized legal and economic context in which aircraft leveraged lease transactions occur, a layperson simply cannot interpret accurately the constituent documents of such transactions or understand the obligations of the various parties thereunder.  For precisely that reason, well-established Second Circuit precedent requires that courts consider extrinsic evidence of the customs, practices, usages and terminology prevalent in an industry ***not only to determine the meaning of industry-specific contractual language, but also to determine whether such language is ambiguous***.

-11-

**1.    The Bankruptcy Court Erred by Not Considering Parol Evidence Regarding the Ambiguity of the Exclusions**

It is well settled that "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and *who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business*." *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (reversing and remanding case to the district court for further proceedings on the unresolved factual issues after finding contract at issue to be ambiguous) (internal quotation marks and citations omitted) (emphasis added).

In fact, the Second Circuit has "*specifically instructed courts to consider the customs, practices, usages and terminology as generally understood in the particular trade or business in identifying ambiguity within a contract*." *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d at 186, *overruled in part on other grounds*, *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006), (internal quotation marks and citations omitted) (affirming district court's consideration of evidence of custom and usage to decide whether contract is ambiguous) (emphasis added); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n. 4 (2d Cir. 2002) (holding that district court erred in declining to consider custom and usage evidence to determine whether an ambiguity existed).[3]  Contrary to this controlling Second Circuit precedent, the Bankruptcy Court refused to consider extrinsic evidence in determining whether the "exclusion provisions" of the TIAs are unambiguous.  In fact, the Bankruptcy Court

---

[3]    Further, "[t]echnical terms or words of art will be given their technical meaning."  11 Williston on Contracts § 32.4 (4th Ed. 1999) (numerous citations omitted).

went further and ***affirmatively precluded the Verizon OPs from doing any discovery whatsoever*** on the exclusion provisions of the TIAs.

> **2.    The Bankruptcy Court's Citation to Dictionary Definitions Does Not Support the Conclusion that the <u>Exclusion Provisions Are Unambiguous</u>**

The Bankruptcy Court's reliance on selective dictionary definitions to support its unambiguous conclusion regarding the meaning of the word "paid" in the exclusion provisions was misplaced because courts have frequently underscored the fact that contract interpretation requires more than ascribing the "plain" meaning of words to contract terms. *See Alexander & Alexander Servcs., Inc. v. Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) ("<u>*Alexander*</u>") ("Dictionary definitions are not determinative of the meaning of [disputed contract terms]").  Indeed, there are numerous examples of courts admitting parol evidence in order to clear up an ambiguity they perceived in contract terms with seemingly obvious and indisputable meanings.  *See e.g., Garza v. Marine Trans. Lines, Inc.*, 861 F.2d 23, 28 (2d Cir 1988) (finding ambiguity in the term "loss or damage"); *Parks Real Estate Purchasing Group v. St Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 45 (2d Cir. 2006) (finding ambiguity in the term "contamination"); *Alexander*, 136 F.3d at 87 (finding ambiguity in the term "client"); *In re Chateaugay Corp.*, 116 B.R. 887, 904 (Bankr. S.D.N.Y. 1990) (finding ambiguity in the term "terminated").  Thus, the dictionary definitions do not support the Bankruptcy Court's conclusion that the exclusion provisions are unambiguous.

> **3.    The Only Evidence in the Record Contradicts the <u>Bankruptcy Court's Interpretation of the Exclusions</u>**

Extrinsic evidence as to the customs and practice in the aircraft leveraged lease industry regarding TIAs and the terminology used in TIAs clarifies the proper interpretation of the exclusion provisions:  the exclusion applies, and Delta is not required to pay the Verizon OP Claims, ***only to the extent that Delta pays SLV in cash in full***.  Only that interpretation

comports with the terms of the Operative Documents and the function owner participants and lessees intend and expect a TIA to serve, *viz.*, to indemnify the owner participant for damages stemming from the airline/lessee's actions or failures to perform its obligations under the operative documents that cause the owner participants to suffer a tax loss.

Only that interpretation comports with the sole extrinsic evidence of the parties' intent in the evidentiary record: the Declaration the Verizon OPs submitted as <u>Exhibit 3</u> to the Verizon OP Response (the "<u>Rutherford Declaration</u>").  Instead of considering such evidence, however, the Bankruptcy Court erroneously refused to consider the Rutherford Declaration because it was similar to the argument made in the Verizon OP Response.  *See Decision*, at 29.  The Bankruptcy Court's analysis does not withstand even modest analytical scrutiny.  The Rutherford Declaration is similar to the argument made in the Verizon OP Response ***because the Verizon OPs' argument is based on the facts identified in the Rutherford Declaration***.  The Rutherford Declaration contains numerous sworn statements of fact that are highly relevant.  There is no basis to discount these sworn statements of fact simply because some of the statements in the Rutherford Declaration may appear argumentative.

In addition, the Bankruptcy Court erroneously reached conclusions regarding the interest and objectives of Delta, and the expectations and contemplations of Delta in entering into the Operative Documents, ***without citation to a single piece of evidence to support such conclusions***.  *See* Decision, at 4-6, 10, 13-15.  The Bankruptcy Court cited no evidence to support its conclusions because ***the evidentiary record contains absolutely no evidence to support such conclusions***.  The Bankruptcy Court apparently created its conclusions based on the arguments made by Delta's counsel, but these arguments are not evidence.  Moreover, because the Verizon OPs were prohibited from taking any discovery whatsoever, the Verizon

OPs never had an opportunity to demonstrate that *even the people who negotiated and executed the Operative Documents for Delta* understood that the exclusion provisions apply to eliminate the Verizon OP Claims only to the extent that SLV is paid in cash in full. The evidence obtained through discovery of Delta likely would confirm this precisely because lessees and owner participants to an aircraft leveraged lease transaction intend and expect a tax indemnity agreement to serve to indemnify the owner participant for damages stemming from the airline/lessee's failure to perform its obligations under the operative documents.

### B.    The Bankruptcy Court Violated Controlling Supreme Court Precedent

The Bankruptcy Court's holding that the word "paid" in the exclusion provisions of the TIAs means "allowed and distributions made in bankruptcy" based on the "bankruptcy context" violates controlling Supreme Court precedent which prohibits altering or eliminating a claimant's rights based solely on the occurrence of bankruptcy. *See Butner*, 99 S.Ct. at 918. As the Supreme Court observed in *Butner*:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Id*. (quoting *Lewis v. Manufacturers National Bank*, 81 S. Ct. 347, 350 (1961)).

In fact, the Supreme Court recently confirmed that contracts *must* be interpreted in accordance with applicable state law, and that interpretation of a contract in the context of a bankruptcy case *must* be the same as interpretation of the contract outside of bankruptcy. *See Travelers*. Specifically, in *Travelers* the Supreme Court clarified that claims are unenforceable under Section 502(b)(1) of the Bankruptcy Code, which the court relied on in the *Decision*, *only if the claims are unenforceable as a matter of applicable nonbankruptcy law*. *See id*.

-15-

The Bankruptcy Court violated this controlling Supreme Court precedent, when stating:

> Suffice it to say that ***"in cash in full" is a reasonable interpretation of "pay/paid" in the context of ordinary course payment obligations under the Lease and even in the extraordinary SLV payment obligation in the context of a solvent airline not in bankruptcy***, i.e., in a context in which one would ordinarily contemplate and expect that a monetary obligation would be paid in cash or equivalent and in full. ***But the "in cash in full" interpretation conflicts with reality in the context of an insolvent airline/lessee in bankruptcy***. It is irrational to suppose that the contract parties contemplated and expected that Delta would pay SLV in cash and in full in a context where Delta could not pay SLV in cash in full as a matter of practical fact because it did not have the cash to do so and because it was legally precluded from doing so under the Bankruptcy Code.

*Decision*, at 27. This language conclusively establishes that the Bankruptcy Court imposed an impermissible "bankruptcy context" rule of contract interpretation in concluding that the Verizon OP Claims should be disallowed instead of relying on applicable state law. In other words, the Bankruptcy Court violated the clear mandate of *Travelers* because the Bankruptcy Court disallowed the Verizon OP Claims not based on applicable state law or a provision of the Bankruptcy Code, but instead based on a different interpretation of the contracts in the "bankruptcy context." *See Travelers*, 127 S.Ct. at 1204-06. Thus, the Bankruptcy Court erred as a matter of law because the Bankruptcy Court relied on a special "bankruptcy" rule of contract interpretation, which the Bankruptcy Court used to justify rewriting the parties' contract by deleting the word "paid" and replacing it with the phrase "allowed and distributions made in bankruptcy" in violation of black-letter New York contract law.

### 1. The Bankruptcy Court Improperly Relied on Selective Dictionary Definitions

The Bankruptcy Court's reasoning was based on citation to 12 dictionary sources, each of which simply noted that ***one*** of the ***possible*** alternative definitions of the word "pay" contained

the word "discharge."[4]  This analysis is inherently flawed.  For example, there are many dictionary definitions of the word "ball."  One is "a spherical or approximately spherical body or shape."  *Dictionary.com Unabridged (v 1.1)*.  Random House, Inc. http://dictionary.reference.com/browse/ball (last visited March 20, 2008).[5]  Another is "a large, usually lavish, formal party featuring social dancing and sometimes given for a particular purpose, as to introduce debutantes or benefit a charitable organization."  *Id*.  If a contract stated that a contracting entity is required to "throw a ball," then it would be unclear whether that entity was required to throw a baseball or to host a large party, either interpretation would be consistent with possible dictionary definitions.  Under the Bankruptcy Court's reasoning, however, ***the contracting party would be in compliance with the contract as long as it performed in a manner consistent with any one of the alternative definitions***.  In fact, this would be the case even if the actual performance was inconsistent with other dictionary definitions and extrinsic evidence demonstrating that the contract party was to host a large party, because under the Bankruptcy Court's reasoning, if the actual performance is consistent with any one of multiple dictionary definitions, no ambiguity exists that would permit the admission of evidence of intent.  This absurd results demonstrates the fundamental errors in the Bankruptcy Court's analysis.

---

[4]    The sources cited by the Bankruptcy Court contain numerous alternative definitions other than the discharge of debt.  For example, *Webster's Third New International Dictionary of the English Language, Unabridged*, which the Bankruptcy Court cited for two definitions of the word "pay" that contain the word "discharge," contains many other definitions that suggest that whether full value is being received is the appropriate consideration, such as "2a: make due return to," "3d: make any agreed disposal of or transfer of," "5a: make compensation for."  *Webster's Third New International Dictionary of the English Language, Unabridged* 1659 (Merriam-Webster, Inc. 1986).  That same dictionary lists synonyms of the word "pay," but none of the synonyms is "discharge."  *Id*. (listing synonyms of pay as compensate, remunerate, satisfy, reimburse, indemnify, recompense or repay).

[5]    *Dictionary.com* is one of the 12 sources the Bankruptcy Court cited in the *Decision*.

The fundamental question before the Bankruptcy Court was whether the term "paid" was more likely to mean "paid in cash in full" or was more likely to mean "allowance and receipt of a distribution on a bankruptcy claim." The choice that a layperson or an everyday business person would make is clear. If 100 persons with experience in commercial transactions were asked if a $100 obligation is "paid" through delivery of stock thought to be worth $50, $60 or $70, all - or almost all - would answer in the negative. Such business persons would not consider such a distribution of stock to constitute "payment" of an obligation. This is extremely important because without evidence concerning the specialized industry of aircraft leveraged lease transactions, the everyday business person's usage and understanding of the word "paid" is exactly what New York law required the Bankruptcy Court to apply. *See Burr v. Commercial Travelers Mutual Acc. Ass'n of America*, 67 N.E.2d 248, 251 (N.Y. 1946) ("Our guide must be the reasonable expectation and purpose of the ordinary business man when making a … contract such as we have here.") *see also IBM Credit Financing Corp. v. Mazda Motor Mfg. (USA) Corp.*, 647 N.Y.S.2d 322, 327 (N.Y. Sup. Ct. 1996) ("The meaning of language used must be found in the common sense and common speech of the average person"). The Bankruptcy Court held that giving value of 50%, 60% or 70% of the amount of an obligation should deem the obligation "paid" as a matter of law. This flies in the face of the reasonable expectations of the ordinary business person and common sense. This interpretation stretches the meaning of the term "paid" beyond the breaking point and should be rejected even if one of the possible definitions found in a dictionary would seem to permit such a result.

In fact, courts have long recognized that the ordinary and common-sense understanding of "paid" means ***actually paid in full***. Where the "definite word 'paid'" is used to define an obligation, it does not mean "constructive payment," and courts may not engage in a "theory of

fiction to give to that word an indefinite meaning" by engrafting unsupported meanings or conditions: "the ordinary and usual meaning of 'paid' is to liquidate a liability in cash" *P.G. Lake, Inc. v. Comm'r*, 148 F.2d 898, 900 (5th Cir. 1945); *see also Scotto v. Brink's, Inc.*, 962 F.2d 225, 226 (2d Cir. 1992) ("the employee is 'paid wages' when the employer **actually pays the wages**, regardless of when the wages might have been earned.") (emphasis added); *Levine v. Ribicoff*, 201 F.Supp. 692, 694 (S.D.N.Y. 1992) ("mere crediting of wages to an employee's account on the employer's books obviously did not constitute an actual payment of wages").

### 2. The Bankruptcy Court Improperly Conflated Claim Allowance and Claim Discharge

The Bankruptcy Court improperly conflated two separate and entirely distinct issues: (1) the ***claims allowance question***, *i.e.*, whether the Verizon OPs have "claims" that "shall" be allowed pursuant to Bankruptcy Code section 502(a) because they have a "right to payment" and an "enforceable obligation" under applicable state law unless SLV is paid; and (2) the ***claims discharge question***, *i.e.*, whether Delta's ability to discharge the claim of the indenture trustee under its plan of reorganization changes the state law analysis of Verizon OP Claims. ***Only the discharge issue, not the allowance issue, is a matter of bankruptcy law in this case***. Whether Delta is liable on the Verizon OP Claims depends upon whether it has proven a valid defense under the Operative Documents — namely, that SLV has been paid in accordance with the relevant contracts. In contrast, whether Delta may discharge the Verizon OP Claims or the claims of the indenture trustee after they have been allowed by distributing stock pursuant to Delta's plan was not properly before the Bankruptcy Court, only the claims ***allowance*** question that is at issue here. Nothing in either the Operative Documents or in the Bankruptcy Code precludes allowance of the Verizon OP Claims. Specifically, nothing in the Bankruptcy Code or otherwise applicable law supports the proposition that a contractual triggering mechanism, which

triggers only upon full payment, may be overridden by discharge in bankruptcy of a debt owed to a different creditor and based on only a partial payment.

If the Bankruptcy Court's rulings were allowed to stand it would wreak havoc on the interpretation of many other commercial practices, including the financial practice of guaranteeing another person's obligations. For example, if Guarantor G guarantees the obligations of Debtor X to Creditor A, Guarantor G's guarantee is not discharged simply because Debtor X and Creditor A have declared Debtor X's obligations to have been discharged as to Creditor A. The very purpose of obtaining a guarantee is to ensure payment in the event of a bankruptcy or inability to pay of the primary obligor. *See e.g., Aetna Cas. & Sur. Co. v. Namrod Dev. Corp.*, 140 B.R. 56, 60 (S.D.N.Y. 1992). Similarly, allowance of and distributions on Creditor B's bankruptcy claim against Debtor Y *does not mean* that a separate and distinct obligation of Debtor Y to Creditor C is considered paid. The fact that Creditor B cannot recover any shortfall on account of its claim against Debtor Y does not mean that Creditor C's separate claim is similarly enjoined.

### 3.    The Bankruptcy Court Improperly Interpreted the TIAs

The Bankruptcy Court's holdings turn both the TIAs and the intent of the parties on their heads. Although the parties certainly were aware of the possibility of a bankruptcy of the lessee, and that in a bankruptcy payments likely would not be made in full, the Bankruptcy Court's conclusions do not follow from these premises. *The Bankruptcy Court's conclusions would mean nothing less than that the parties intended for there to be no TIA claim in the event of a bankruptcy of the lessee because allowing a claim based on SLV in any amount which resulted in distributions, regardless of the amount of the distributions, would cause the exclusion provisions to apply.* This makes no sense and would render the TIAs a nullity in violation of black-letter New York contract law because a bankruptcy of the lessee is one of the

-20-

primary instances in which an owner participant needs the TIAs. *RM 14 FK Corp. v. Bank One Trust Co., N.A.*, 831 N.Y.S.2d 120 (N.Y. App. Div. 2007) (upholding the principle that a contract should not be interpreted so as to render any clause meaningless).

The proper conclusions from the premises the Bankruptcy Court identified are that the parties intended the word "paid" to mean "paid," not "allowed and distributions made in bankruptcy," and that the parties ***would have included*** the words "or allowed and distributions made in bankruptcy" if they intended such a result. Succinctly, it was perfectly reasonable for the parties to intend the word "paid" to mean paid in cash in full in ***all contexts*** so that the exclusion provisions would ***not*** be triggered in connection with an SLV claim in a bankruptcy case unless the SLV claim represented the full amount of Stipulated Loss Value and was paid in cash in full. Thus, the ultimate conclusion from the Bankruptcy Court's premises is that the parties did ***not*** intend for the exclusion provisions to apply simply if a claim for some portion of SLV was allowed and distributions were made in the bankruptcy of the lessee because otherwise the TIA claim would be excluded in nearly all bankruptcy cases, which is directly contrary to the purpose of the TIAs and the intent of the parties.

Simply put, nowhere in the *Decision* does the Bankruptcy Court identify the applicable state law on which it was relying to re-write the parties' contracts. The Bankruptcy Court failed to identify any applicable state law because none exists. For example, to comply with *Travelers*, the Bankruptcy Court's holdings must apply both in the context of bankruptcy and in the context of an analogous state court proceeding, such as a state court receivership, because in each instance, it is unlikely that SLV would be paid in full. Otherwise, the contract would be interpreted differently solely based on the context of a bankruptcy. The fundamental error in applying the *Decision* to a New York state court receivership, however, is that no New York

-21-

state court ever would interpret the word "paid" to mean "allowed and distributions made in a receivership" precisely because such an interpretation would re-write the parties' contract in violation of black-letter New York law.

The following example proves the point: Suppose SLV following a termination of the lease outside of bankruptcy is $100, $75 of which is payable to the lender on account of its outstanding debt, and $25 of which represents potential compensation to the owner participants. Outside of bankruptcy, if the lessee pays only $60 of SLV (whether by settlement with the lender or otherwise), and all of that payment goes to reduce, but not pay off, the $75 debt to the lender, the owner participant will receive nothing through the "waterfall" and, thus, clearly will have a TIA claim directly against the lessee. Under the Bankruptcy Court's analysis, if the lease is terminated through a rejection in bankruptcy, the allowance of the entire SLV claim at $100 and subsequent distributions of only $60 operate to eliminate the owner participant's TIA claim in its entirety through the exclusion, even though the owner participant will receive no compensation whatsoever from the $60 distribution on the SLV claim. *Under the Bankruptcy Court's analysis, therefore, the existence of TIA claims turns exclusively on whether the lease is terminated outside of bankruptcy or through a rejection in bankruptcy*. Under the Bankruptcy Court's analysis, the allowance and distribution process in bankruptcy effectively confers a windfall on the Debtors by enabling them to avoid paying anything in respect of TIA claims that, outside of bankruptcy, would be valid and enforceable in their entirety. Such discriminatory treatment of the Verizon OPs' TIA claims in bankruptcy constitutes both an egregious violation of *Butner* and *Travelers*, and reversible error.

### C.    The Bankruptcy Court Violated Controlling New York Contract Law

The Bankruptcy Court rewrote the parties' contracts and ignored critical provisions in direct violation of controlling New York contract law which prohibits courts from re-writing parties' agreements and requires courts to interpret contracts as a whole, giving meaning to all provisions in related contracts. *See, e.g., Terwilliger*, 206 F.3d at 245 ("a court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." (citations omitted).; *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y. 2d 352 (N.Y. 2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose."); *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (interrelated contracts involved in a single transaction must be interpreted as a whole, consistent with the purpose of the transaction). The Bankruptcy Court violated black-letter New York contract law and committed reversible error by refusing to give effect to the terms of the Operative Documents, including (i) the definition of Stipulated Loss Value; (ii) the requirement that all payments by Delta be made in immediately available funds; and (iii) the requirement that the effect of the Operative Documents does not change as a result of a bankruptcy of Delta.

### 1.    Stipulated Loss Value Is a Specific Defined Amount

The Operative Documents define Stipulated Loss Value to be a specific dollar amount at any given time. *See* Lease Agreements, § 1. Thus, the phrase "is required to pay Stipulated Loss Value or Termination Value, to the extent such amounts have been paid" as used in the exclusion provisions of the TIAs must be read to apply only if the specific dollar amount that is Stipulated Loss Value is paid. The payment of any other amount simply is not payment of Stipulated Loss Value, and therefore is not "such" an amount, as that term is used in the exclusion provisions.

### 2.     All Payments Must Be Made in Immediately Available Funds

The Operative Documents also require that all amounts paid by the lessee, Delta, be paid in U.S. dollars in immediately available funds.  *See* Lease Agreements, § 3(d); Tax Indemnity Agreements, § 13.  Thus, the payment of Stipulated Loss Value as described in the exclusion provisions of the TIAs must be made in cash.  Moreover, because Stipulated Loss Value is a specific dollar amount, the payment of "such" amount of Stipulated Loss Value required to trigger the exclusion provisions of the TIAs *only* can occur if Stipulated Loss Value is paid in full and in cash.  Any other reading fails to take into account all of the relevant provisions of the Operative Documents, and in so doing violates fundamental New York contract law which requires that interrelated contracts involved in a single transaction must be interpreted as a whole, consistent with the purpose of the transaction.  Thus, the Bankruptcy Court was flat wrong to conclude that the exclusion provisions do not say "paid in full in cash."  *Decision*, at 11.  When the Operative Documents are read as a whole as required by controlling New York contract law, the exclusion provisions unequivocally provide that to trigger the exclusion provisions, payments must be made in the amount that constitutes SLV and must be in cash.

### 3.     The Meaning of the Exclusion Provisions Did Not Change As a Result of Delta's Bankruptcy

The fundamental premise of the Bankruptcy Court's holding, that the parties agreed to have the Operative Documents interpreted differently in the "bankruptcy context," is expressly repudiated by the Operative Documents.  The Operative Documents provide that the obligations of Delta to make payments under the Leases, which includes payments of Stipulated Loss Value, are not affected by any circumstance, including the bankruptcy of Delta.  *See* Lease Agreements, § 20.  Thus, the Bankruptcy Court clearly erred in suggesting the parties "must have intended"

for there to be a reduction or alteration of Delta's payment obligations if it filed for bankruptcy relief because the Operative Documents say just the opposite.

## VII.    CONCLUSION

The Bankruptcy Court disallowed over $80,000,000 of Verizon OP Claims by imposing a "bankruptcy context" interpretation on the TIAs, re-writing the TIAs and prohibiting the Verizon OPs from conducting discovery regarding the meaning of the exclusion provisions, and thereby violated controlling Supreme Court precedent, New York contract law, and controlling Second Circuit precedent. This was manifest error. Accordingly, the Verizon OPs respectfully request that this Court (i) reverse the Disallowance Order, direct the Bankruptcy Court to enter an order allowing the Verizon OP Claims as to liability, and remand for determination of their proper amounts, or (ii) alternatively, remand for further evidentiary proceedings and direct the Bankruptcy Court to consider extrinsic evidence.

Dated: New York, New York
        March 26, 2008

HUNTON & WILLIAMS LLP

By: /s/ Scott H. Bernstein

Peter S. Partee                                Benjamin C. Ackerly
Scott H. Bernstein                             Jason W. Harbour
200 Park Avenue, 53rd Floor                    Riverfront Plaza, East Tower
New York, New York 10166-0136                  951 East Byrd Street
(212) 309-1000 (telephone)                     Richmond, Virginia 23219-4074
(212) 309-1100 (facsimile)                     (804) 788-8200 (telephone)
ppartee@hunton.com                             (804) 788-8218 (facsimile)
sbernstein@hunton.com                          backerly@hunton.com
                                               jharbour@hunton.com

*Attorneys for Bell Atlantic Tricon Leasing Corporation,*
*NCC Golf Company, NCC Key Company*
*and NCC Charlie Company*

2007 U.S. Dist. LEXIS 5422, *

LEXSEE

**In re: UAL CORPORATION, et al., Reorganized Debtors. GENERAL FOODS CREDIT CORPORATION, Appellant, v. UNITED AIR LINES, INC., et al., Appellees/Cross-Appellants.**

**Case No. 06 C 4243**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2007 U.S. Dist. LEXIS 5422**

**January 22, 2007, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant corporation appealed from a bankruptcy court's order which ruled that: certain Tax Indemnity Agreements (TIA) claims had to take into account the tax savings that the corporation would realize; and the base indemnity was to be treated as if the claims were outside bankruptcy; therefore, the gross-up was based on a whole dollar basis. Appellee debtor opposed the appeal.

**OVERVIEW:** The corporation provided financing for the purchase of airplanes by debtor. In order to protect against tax consequences that were not anticipated, the parties entered into TIAs, one for each of the financed aircraft. The TIA set forth the means of calculating the required indemnification. The corporation's interpretation of the TIA transformed the TIA's purpose from indemnifying the corporation's for the loss of certain tax benefits to indemnifying the corporation for the loss of net economic return. This was inconsistent with the parties' manifest intent in the TIA. The bankruptcy court computed the "gross-up" based on what the corporation would have recovered pursuant to the TIA. However, because of debtor's bankruptcy, the corporation would not receive the full contemplated amount. Under the corporation's interpretation, it would have received an amount of money based on increased tax liability beyond the actual amount it was required to pay. However, this would have been inconsistent with the manifest intent of the TIA as it would overcompensate the corporation; which would receive a greater amount of indemnification for tax liability than that which it was required to pay.

**OUTCOME:** The order of the bankruptcy court was affirmed in part and reversed in part, and the case was remanded to the bankruptcy court.

**CORE TERMS:** tax savings, aircraft, lease, tax consequences, calculated, gross-up, default, required to pay, indenture, after-tax, cash flow, tax liabilities, foreclosure, indemnity agreements, indemnity, indemnity claims, anticipated, realization, grossed-up, financing, interpreting, contingent, equipment notes, amount payable, tax benefits, taxes required, income tax, taxable gain, indemnification, calculation

**COUNSEL:** [*1] For General Foods Credit Corporation, Appellant: David S. Curry, John James Voorhees, Jr., Mayer, Brown, Rowe & Maw LLP, Chicago, IL.

For United Airlines, Inc., Appellee: Marc Kieselstein, Rebecca O'Neal Fruchtman, Kirkland & Ellis LLP (Chicago), Chicago, IL.

**JUDGES:** JOHN W. DARRAH, United States District Court Judge.

**OPINION BY:** JOHN W. DARRAH

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the appeal of the Bankruptcy Court's July 7, 2006 Order. For the reasons that follow, the July 7, 2006 Order of the Bankruptcy Court is affirmed in part and reversed in part.

**BACKGROUND**

In 1992, United Air Lines, Inc. entered into leveraged lease transactions to finance the acquisition of six aircraft, Tail Nos. N567UA through N572UA. In each of the transactions, United purchased the aircraft from a

manufacturer and contemporaneously sold all of its interests to an "owner trustee." Concurrent with the sale of the aircraft to the owner trustee, the owner trustee leased the aircraft back to United pursuant to a lease agreement.

General Foods Credit Corporation, as "owner participant," provided equity financing for each purchase. The financing provided by General [*2] Foods represented only a portion of the cost of the aircraft. To finance the balance of the investment, the owner trustee -- which holds title for the benefit of the owner participant -- issued non-recourse equipment notes through a trust indenture and mortgage. The indenture trustee, acting on behalf of the noteholders, obtained a security interest in the owner trustee's rights both in each aircraft and under each lease with United.

As part of the transactions, General Foods anticipated receiving a defined return -- primarily based on cash flow from the leases (net of the amount needed to service the equipment notes) and from the tax consequences arising from the structure of the transaction (amortization of the aircraft and interest deductions from note payments). In order to protect against tax consequences that were not anticipated, United and General Foods entered into Tax Indemnity Agreements ("TIA"), one for each of the financed aircraft, which sets forth the terms under which United is required to indemnify General Foods against tax consequences that differ from the ones factored into the pricing of the lease. [1] The TIA states that the parties "intend to set forth their agreement [*3] with respect to the circumstances under which the Lessee shall be required to indemnify the Owner Participant for the loss of certain . . . tax benefits . . . ."

> 1   While different operative documents were entered into for the six aircraft, the documents are substantially similar; and the parties presented their arguments based on the operative documents for Tail No. N569UA. The Court's analysis, using the same operative documents, applies to all six transactions.

Section 5 of the TIA sets forth the manner in which a claim under the TIA was to be calculated. This section provided, in pertinent part:

> (b) Indemnity. The amount payable by reason of any Loss shall be a lump sum amount which, on an After-Tax Basis, shall cause the Owner Participant's Net Economic Return to be maintained after taking into account the sum of the following amounts payable by the Owner Participant with respect to such Loss: (A) the additional Federal and State income tax payable as a result of such Loss, and (B)

any interest, [*4] additions to tax or penalties associated with such Federal income tax . . . (the sum of (A) and (B) referred to as the "Before-Tax Amount").

> The calculation of such lump sum amount shall: . . . (C) take into account any Tax Savings reasonably expected to be available to the Owner Participant as a result of the Loss or Losses expected . . . .

> (c) Tax Savings. If, as a result of a Loss for which indemnification is paid by the Lessee hereunder, the Owner Participant shall recognize any Tax Savings not taken into account under Section 5(b) above in determining the amount payable to the Owner Participant under Section 5(b), then, provided no Default or Event of Default shall have occurred and be continuing, the Owner Participant shall pay to the Lessee an amount equal to the sum of such Tax Savings realized by the Owner Participant plus the amount of any Tax Savings Gross-Up. . . .

"After-Tax Basis" is defined in the TIA, in relevant part, as "an amount which, after the deduction of all Federal, state, local and foreign taxes required to be paid by or on behalf of the Owner Participant in respect of the receipt or realization of such amount, is equal to the payment required [*5] to be made to the Owner Participant under any provision of this Agreement . . . ." "Tax Savings" is defined in the TIA as "the amount of Federal and State income tax savings, calculated as provided in Section 5(c), which the Owner Participant recognizes as a result of a Loss (as defined in Section 5(a)) for which Lessee is required to indemnify the Owner Participant." "Tax Savings Gross-Up" is defined in the TIA as "the amount of Federal, state, local and foreign income tax savings, calculated as provided in Section 5(c), which the Owner Participant recognizes as a result of any payment made to the Lessee by the Owner Participant (including a payment in respect of a Tax Savings Gross-Up)."

"Net Economic Return" is defined, in relevant part, in the lease as:

> the Owner Participant's net after-tax book yield, aggregate after-tax cash flow and no less than 100% of book income for each year prior to the fifth anniversary of the Closing Date, and book income shall not be increased or decreased by more than 10% for each subsequent year of the

Lease Term, utilizing the multiple investment sinking fund method of analysis computed on the basis of the same methodology and assumptions [*6] as were utilized by the Owner Participant in determining Basic Rent, Excess Amount, Stipulated Loss Value percentages . . . .

Section 8 of the TIA provides:

Section 8. Adjustment of Stipulated Loss Value and Termination Value. If any amount is required to be paid hereunder by the Lessee with respect to a Loss and is actually so paid, the Owner Participant shall cause the Lessor to recompute Stipulated Loss Value and Termination Value percentages with respect to the Aircraft to reflect such Loss in accordance with the manner in which such values were originally computed, or adjusted pursuant to Section 3 of the Lease, by the Owner Participant, . . . . In no event shall Stipulated Loss Value or Termination Value as recomputed for any period be less than the principal amount, premium, if any, and accrued interest on the Loan Certificates. Any recomputation under this Section 8 shall not take into account any Tax Law Changes.

"Stipulated Loss Value" is defined in the lease, in relevant part, as:

with respect to the Aircraft as of any date through and including the last day of the Basic Term, means the amount determined by multiplying Lessor's Cost for the Aircraft [*7] by the percentage specified in Exhibit C hereto opposite the Stipulated Loss Value Date with respect to which the amount of Stipulated Loss Value is determined (as such Exhibit C may be adjusted from time to time as provided in Section 3(c) hereof and in Section 8 of the Tax Indemnity Agreement).

On December 9, 2002, United filed a voluntary petition under Chapter 11 of Title 11, United States Code. At the same time, United ceased making rental payments under the leases. United's failure to pay the rents resulted in a default under the mortgages, repossession of the aircraft by the indenture trustee, and the assertion of secured claims against United. As a result of a settlement between United and the indenture trustee, the six aircraft have been sold; and General Foods will be taxed on the gain recognized at the time of the sale.

General Foods filed a claim against United under the TIAs for the additional tax liabilities that it will incur as a result of the indenture trustee's foreclosure and sale of the aircraft. General Foods' amended claim sought approximately $ 95 million under the TIAs and an expense claim for the balance. The parties agreed on the treatment of the expense [*8] claim, leaving the TIA claims at issue.

General Foods' taxable gain occasioned by the foreclosures resulting from United's defaults was calculated in accordance with the provisions of the TIAs. This taxable gain and the resulting tax liabilities constitute cash outflows that were not anticipated or assumed in the initial calculation of Net Economic Return. The gain at the foreclosure sales equaled the balance of the outstanding notes less any remaining tax basis in the aircraft. The taxable gain realized by General Foods upon the foreclosures was multiplied by the tax rate specified in the TIAs. The parties do not dispute the amount of General Foods' taxable gain or the calculation of tax thereon due to the foreclosure sales.

However, United objected to the amount of General Foods' TIA claims, arguing that the TIA claims should be reduced by the tax savings General Foods would realize as a result of not receiving lease payments from United and that the "gross-up" adjustment to the claim, which compensates General Foods for taxes that would be incurred on any payment that it receives pursuant to the TIAs, must be calculated based on the diminished payments that General Foods will [*9] actually receive on its TIA claims under United's Chapter 11 plan.

On July 7, 2006, the Bankruptcy Court issued an Order, ruling that: (1) the TIA claims must take into account the tax savings that General Foods will realize; and (2) the base indemnity was to be treated as if the claims were outside bankruptcy; therefore, the gross-up was based on a whole dollar basis. Based on the Bankruptcy's rulings, the TIA claims were reduced and allowed as a $ 20,990,878.92 general unsecured claim.

## LEGAL STANDARD

A bankruptcy court's conclusions of law are reviewed *de novo*. *See In re Heartland Steel, Inc.,* 389 F.3d 741, 743-44 (7th Cir. 2004). The court reviews the bankruptcy court's factual findings for clear error. *Hoseman v. Weinschneider,* 322 F.3d 468, 473 (7th Cir. 2003). The

parties agree that the agreements are governed by New York law.

The Court's role in interpreting a contract "is to ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.,* 1 N.Y.3d 452, 458, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004). If the parties set forth their agreement in a clear, complete document, the document is to be enforced [*10] according to the document's terms. *See Reiss v. Financial Performance Corp.,* 97 N.Y.2d 195, 198, 764 N.E.2d 958, 738 N.Y.S.2d 658 (2001). When interpreting a contract, contemporaneous agreements that are part of the same transaction should be read together. *See Smith v. Shields Sales Corp.,* 22 A.D.3d 942, 802 N.Y.S2d 764, 765 (2005).

## ANALYSIS

General Foods raises two issues on appeal -- whether the Bankruptcy Court erred in (1) not allowing General Foods' tax indemnity claims against United in an amount sufficient to preserve General Foods' Net Economic Return and (2) reducing General Foods' indemnity claims by future tax savings. United raises one issue on appeal -- whether the Bankruptcy Court erred in requiring that the "gross-up" provided in the tax indemnity agreements be calculated without regard to the actual tax consequences to General Foods arising from the fractional distribution of General Foods' base indemnity claim under the Reorganized Debtors' confirmed plan of reorganization. [2]

2    United voluntarily withdrew a second issue during this appeal.

[*11] Preservation of General Foods' Net Economic Return

General Foods argues that the Bankruptcy Court's finding that Tax Savings were required to be subtracted from General Foods' TIA claim failed to "maintain" General Foods' "Net Economic Return" as mandated in Section 5(b) of the TIA. General Foods contends that the TIA mandates that Net Economic Returns be maintained and allows Tax Savings to be "taken into account" only to accomplish that result. However, "taken into account" does not mean automatically subtracting any Tax Savings but means that the parties must consider both the tax gains and losses that flow from the Loss and then take them into account as necessary in order to arrive at a lump-sum amount that maintains General Foods' Net Economic Return. In order to "maintain" General Foods' Net Economic Return, there can be no offset for future income taxes that General Foods avoided when those taxes would otherwise have been paid from rental income that General Foods will not now receive because of United's default.

The Bankruptcy Court also rejected this same argument, finding that the reference to the Net Economic Return does not increase the TIA claims beyond the net [*12] change in tax consequences but provides a cap on the claim -- General Foods cannot receive any sum greater than the Net Economic Return.

General Foods' interpretation of Section 5(b) is inconsistent with the purpose of the TIA and is not supported by the plain language of Section 5(b). General Foods' interpretation of Section 5(b) transforms the TIA's purpose from indemnifying General Foods for the loss of certain tax benefits to indemnifying General Foods for the loss of Net Economic Return. This is inconsistent with the parties' manifest intent in the TIA.

Consistent with the parties' stated intention, Section 5(b) of the TIA sets forth the means of calculating the required indemnification -- adding the additional taxes payable as a result of the Loss and any interest, additions to tax or penalties associated with such Federal income tax and subtracting (taking into account) any tax savings reasonably expected to be available to General Foods as a result of the Loss. This amount cannot be greater than General Foods' Net Economic Return.

This interpretation is also supported by other provisions of the financing documents. The total damages available under the Lease are defined [*13] as Stipulated Loss Value ("SLV"). The SLV includes both the cash flows under the Lease and General Foods' expected tax benefits. However, General Foods assigned all of the cash flows under the Lease as security to the indenture trustee. Therefore, the only part of the SLV that the TIA protects is the net tax consequences. If the TIA indemnity was construed as intending to provide General Foods with more than the net tax consequences, the TIA would erode the cash flows from payments on the Lease securing the equipment notes. This would be inconsistent with the intention and purpose of the financing agreements entered into between the parties as part of this transaction.

General Foods also argues that Section 5(c) of the TIA provides that Tax Savings are not taken into account if United is in default. However, Section 5(c) specifically applies to "Tax Savings not taken into account under Section 5(b)." Here, Tax Savings were taken into account as provided in 5(b); accordingly, Section 5(c), by its own terms, is not applicable. Furthermore, Section 5(c)'s exclusion of reimbursement of Tax Savings if United is in default does not also apply to Section 5(b). Section 5(c) specifically included [*14] the exclusion in case of default; Section 5(b) did not include such an exclusion, and this condition cannot be read into that section.

Reduction of General Foods' Indemnity Claims for Future Tax Savings

United argues that the Bankruptcy Court erred in "grossing-up" General Foods' claim based on a hypothetical whole dollar basis rather than "grossing-up" General Foods' claim based on what General Foods will actually receive.

Pursuant to Section 5(b), General Foods is entitled to a payment under the TIA for an amount that reimburses General Foods for the change in tax consequences on an "After-Tax Basis." Because the amount General Foods will receive under the TIA is itself taxable, General Foods' claim must be increased, or "grossed-up," in an amount to insure that General Foods is compensated in full for the change in tax consequences. The Bankruptcy Court computed the "gross-up" based on what General Foods would have recovered pursuant to the TIA. However, because of United's bankruptcy, General Foods will not receive the full contemplated amount.

Pursuant to the TIA, United is required to pay General Foods "an amount which, after the deduction of all Federal, state, local [*15] and foreign taxes required to be paid by or on behalf of the Owner Participant in respect of the receipt or realization of such amount, is equal *to the payment required to be made* to the Owner Participant under any provision of this Agreement . . . ." (Emphasis added). General Foods (and the Bankruptcy Court) interpreted this section to require the gross-up amount to be calculated on what United would be required to pay General Foods without taking into consideration the bankruptcy, which will result in General Foods' actually receiving and being taxed on an amount lower than that calculated by the TIA. United argues that the claim should be grossed-up based on the anticipated amount General Foods will receive from the bankruptcy distribution, not what would have been due prior to the bankruptcy.

The above-quoted language requires United to reimburse General Foods for all adverse tax liability it suffers as a result of a Loss, including all taxes General Foods is required to pay resulting from the receipt or realization of an indemnity payment from United -- the grossed-up amount. The quoted language specifically provides for payment (claim) equal to that which is "required to [*16] be paid." Here, the taxes that General Foods will be "required" to pay will be less than what is actually due under the TIA because of United's bankruptcy. The actual amount of taxes General Foods will be required to pay should have been the grossed-up amount awarded by the Bankruptcy Court. General Foods, in arguing to the contrary, fails to consider the full definition of "After-Tax Basis" and ignores the language "after the deduction of

all Federal, state, local and foreign taxes *required to be paid* by or on behalf of the Owner Participant in respect of the receipt or realization of such amount." (Emphasis added). Under General Foods' interpretation, General Foods would receive an amount of money based on increased tax liability beyond the actual amount it will be required to pay. This would be inconsistent with the manifest intent of the TIA as it would overcompensate General Foods; which would receive a greater amount of indemnification for tax liability than that which it is required to pay.

United's interpretation is not inconsistent with the Bankruptcy Code, which provides that claims are calculated as of the date of the bankruptcy filing. *See* 11 U.S.C. §§ 365(g) [*17]  , 502(b). Section 502(b) provides that a claim amount is determined as of the date of the filing of the petition. 11 U.S.C. § 502(b). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secure, or unsecured." 11 U.S.C § 101(5)(A). General Foods' claim, as of the petition date, constituted a contingent claim. *See In re Manville Forest Prod. Corp.,* 209 F.3d 125, 129 (1st Cir. 2000) (party that was signatory of indemnity agreement signed pre-petition had a contingent claim). Pursuant to Section 502, General Foods' claim is to be valued as of the petition date. Interpreting the TIA to allow for reimbursement of taxes based on actual tax consequences is not inconsistent with Section 502 because Section 502 does not prevent the parties from contracting as to how to calculate certain future damages. *See* 11 U.S.C. § 502; *In re Fast,* 318 B.R. 183, 193-94 (Bankr. D. Colo. 2004) (Section 502 does not preclude a claim for [*18]  fees if fees are provided for by contract).

## CONCLUSION

Based on the foregoing, the July 7, 2006 Order of the Bankruptcy Court is affirmed in part and reversed in part. The matter is remanded to the Bankruptcy Court for further proceedings consistent with this ruling.

Dated: January 22, 2007

JOHN W. DARRAH

United States District Court Judge

LEXSEE

**PHILIP MORRIS CAPITAL CORPORATION and HNB INVESTMENT CORP., Appellants/Cross-Appellees, v. KMART CORPORATION, et al., Appellees/Cross-Appellants.**

**No. 07 C 1926**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2007 U.S. Dist. LEXIS 79531**

**October 24, 2007, Decided**
**October 24, 2007, Filed**

**PRIOR HISTORY:** [*1]
  07-1926.071-JCD.
In re Kmart Corp., 362 B.R. 361, 2007 Bankr. LEXIS 536 (Bankr. N.D. Ill., 2007)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** This case was before the court on appeal from a bankruptcy court's decision which resolved certain claims in the bankruptcy reorganization of appellee debtor, relating to a leveraged lease transaction involving several discount department stores. Both the debtor and appellants, the other parties involving in the transaction, including a beneficiary of a tax indemnification agreement (TIA), challenged aspects of the bankruptcy court's decision.

**OVERVIEW:** In this case, the debtor sold retail properties to a series of owner trusts and entered into lease agreements with each of the trusts. The agreements included TIAs that essentially required the debtor to indemnify for lost tax benefits in the event that the transaction ended prematurely. The debtor argued that claims filed in its bankruptcy proceeding by the beneficiary of the TIAs were subject to the cap on damages set out in 11 U.S.C.S. § 502(b)(6). The bankruptcy court disagreed, and the court affirmed on review. Here, the claims arose under the TIAs and not under the rejected leases. In order to declare the TIA beneficiary the true lessor, the court would have to re-characterize the entire transaction. Thus, it could not be said that the claims were for damages resulting from a lease termination as was required to apply the § 502(b)(6) cap. The court also affirmed the bankruptcy court's determination that the claims were subject to an offset. The court found that the TIAs were intended to indemnify for adverse tax consequences, not for all adverse consequences. Accordingly, the court agreed with the bankruptcy court that the TIA permitted tax savings deductions from the claims.

**OUTCOME:** The court affirmed the bankruptcy court's findings of fact and conclusions of law and related orders.

**CORE TERMS:** lease, tax savings, indemnity, lessor, cap, calculation, indenture, leveraged, default, rent, conclusions of law, tax benefits, termination, inclusion, after-tax, damages resulting, reorganization, deeds-in-lieu, foreclosure, pursuit, calculated, tax consequence, cash flow, agreed order, termination of a lease, expert witness, cross-appeal, indemnify, assignor, pricing

**COUNSEL:** For Philip Morris Capital Corporation, HNB Investment Corp., Appellants: Thomas Joseph Magill, LEAD ATTORNEY, Christopher Combest, Leonard Stewart Shifflett, Quarles & Brady LLP, Chicago, IL.

For KMart Corporation and its debtor-affiliates, Appellee: Craig Goldblatt, Wilmer, Cutler Pickering Hale and Dorr LLP, Washington, DC; William John Barrett, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL.

**JUDGES:** John F. Grady, United States District Judge.

**OPINION BY:** John F. Grady

**OPINION**

## MEMORANDUM OPINION

This case is before us on appeal from Bankruptcy Judge Sonderby's Findings of Fact and Conclusions of Law and related orders of February 14, 2007, which resolved certain claims in the bankruptcy reorganization of Kmart Corporation ("Kmart") relating to a leveraged lease transaction involving sixteen Kmart stores. For the reasons explained below, the orders of the bankruptcy court are affirmed.

## BACKGROUND

In May 1995, Kmart entered into a complex form of a structured-finance transaction referred to as a leveraged lease with Philip Morris Capital Corporation and its wholly-owned subsidiary, HNB Investment Corp. (to whom we will refer collectively as "Philip Morris") and various other entities. In [*2] general terms, such a transaction involves a series of agreements among several parties through which one party finances property by engaging in a sale and leaseback of the property with an investor whose primary motivation is to obtain the tax benefits associated with the property. In this case, Kmart sold sixteen of its retail properties to a series of "Owner Trusts" for $ 170 million. Kmart then entered into lease agreements with each of the sixteen Owner Trusts and continued, as lessee, to operate those retail stores. The overarching agreement in the transaction was referred to as the "Participation Agreement," and other agreements included the "Purchase Agreement," the "Tax Indemnification Agreement," and the "Leases."

Before entering into the transaction, Philip Morris ran a sophisticated and complex computer program designed to identify the expected return on its investment. The program generated reports, referred to as the "ABC Pricing Files," upon which the pricing of the properties was based. After considering the reports, Philip Morris, acting as an "Owner Participant," made a $ 22 million equity investment in the Owner Trusts in partial payment for the properties; the balance [*3] of the $ 170 million purchase price was financed through a public bond offering for which the Bank of New York ("BONY") served as an indenture trustee. The bond offering was secured by mortgages against the sixteen properties in addition to assignments of the sixteen store leases, but was otherwise non-recourse.

Kmart paid rent on the properties to the Owner Trusts. The Owner Trusts, in turn, made payments on the debt service to BONY and for certain other fees. After those payments were made, the remaining "free cash" was transferred by the Owner Trusts to Philip Morris. For income tax purposes, the Owner Trusts were treated as pass-through entities; therefore, Philip Morris could claim tax deductions for periodic depreciation on the

properties and for interest on the bond indenture obligations. At the same time, Philip Morris was required to report the full amount of the rental payments from Kmart as its taxable income.

About seven years after the parties entered into the leveraged lease transaction, on January 22, 2002, Kmart and numerous affiliates filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. Because the bankruptcy filings [*4] constituted an event of default under the bond indentures, all principal and unaccrued interest amounts were accelerated and became due. BONY, as indenture trustee, exercised its right to recover the rents due under the leases, including noticing foreclosures on some of the properties.

Within the bankruptcy proceedings, Kmart elected to assume six of the leases upon the subject properties and to reject the remaining ten leases. The Owner Trusts eventually executed deeds-in-lieu of foreclosure in favor of BONY in satisfaction of the underlying non-recourse mortgage debt against those ten properties. The deeds-in-lieu caused Philip Morris to realize debt forgiveness income and to become liable for the tax on that income.

Philip Morris's realization of income and its consequent tax liability as a result of the deeds-in-lieu of foreclosure is at the heart of this appeal due to a Tax Indemnification Agreement ("TIA") that the parties entered into as part of the leveraged lease transaction. Essentially, the TIA required Kmart to indemnify Philip Morris for lost tax benefits in the event that the transaction ended prematurely. The TIA provides, in pertinent part:

> **Section 3. Indemnified Losses.** [*5] (a) Consistent with subsection (b), (i) if as a result of: . . . (VII) any pursuit of remedies (whether by the Owner Participant or Indenture Trustee or otherwise) following an Event of Default . . . the Owner Participant . . . (B) shall be required to include in gross income for Federal, state or local income tax purposes any amount not described in any of clauses (i) through (vi) of paragraph (i) of Schedule B hereto (an "Income Inclusion"): (any of the foregoing events in clauses (A) or (B) above so resulting being referred to hereinafter as a "Loss"), Kmart will pay to the Owner Participant an indemnity, determined pursuant to either clause (y) or (z) below.

(R. 2 at 3-4.) The parties agreed that the amount of the tax indemnity was to be determined using clause (z), which is discussed infra.

In April 2003, the bankruptcy court began its hearing on the confirmation of Kmart's Plan of reorganization. About 165 objections to confirmation of the Plan were filed, many by Kmart's landlords. BONY filed such an objection, raising several issues. On April 22, 2003, Kmart, BONY, and other lessors entered into a stipulation "resolving certain lessor objections to confirmation and establishing [*6] agreed claims resolution procedures." BONY agreed to withdraw its objection to confirmation of the Plan, and Kmart agreed to an expedited claims resolution procedure. On April 23, 2003, the bankruptcy court entered an order confirming the Plan.

Approximately one month later, Kmart objected to BONY's claims. After an evidentiary hearing date was set, BONY and Kmart resolved their disputes and submitted a proposed order to the bankruptcy court. The court entered the BONY Order, and Kmart was directed to serve copies of the order on counsel for Philip Morris, which then had ten days to file any objections. Philip Morris received the BONY Order and asked Kmart and BONY for a clarification. Kmart, BONY, and Philip Morris agreed to amend the BONY Order to accommodate this request for clarification. On November 3, 2003, the bankruptcy court entered an amended agreed order resolving BONY's claims.

Between July 31, 2002 and June 5, 2003, Philip Morris filed the claims involved in this appeal, which totaled $ 30,374,127. The claims were allocated as follows: $ 21,080,373 under the TIA and the remainder under the general indemnity of the Participation Agreement. Only the claims asserted under the [*7] TIA are at issue on appeal. Kmart objected to Philip Morris's claims, and the bankruptcy court held an evidentiary hearing that lasted several days. Kmart argued that the claims were precluded entirely by the Agreed Order or alternatively subject to the cap on damages set out in § 502(b)(6) of the Bankruptcy Code. Putting aside these arguments, Kmart acknowledged that Philip Morris was entitled to its claims under the TIA, but contended that three categories of deductions to the claims were appropriate based on "tax savings" that Philip Morris would enjoy due to the early termination of the transaction. Philip Morris, on the other hand, argued that the Agreed Order precluded Kmart from raising the the § 502(b)(6) issue; that Kmart was estopped from raising the issue; that the cap did not apply in any event; and that the full amount of its claims should be awarded because Kmart's proposed deductions were not allowed under the TIA and because the calculations of Kmart's expert witness had no evidentiary value.

In a detailed written opinion titled "Findings of Fact and Conclusions of Law," In re Kmart Corp., 362 B.R. 361 (Bankr. N.D. Ill. 2007) (Docket No. 30688), Bankruptcy Judge Sonderby [*8] held that neither party had proved its claim preclusion argument, but that the doctrine of issue preclusion prevented Kmart from arguing that the § 502(b)(6) cap applied to the claims. The bankruptcy court further held that even if Kmart was not precluded from raising the issue, the cap would not apply to the claims. As for determining the amount of the claims, the bankruptcy court found that Philip Morris's tax indemnity claims had to be reduced by $ 16,771,747 for "Tax Savings" and thus that the allowable portion of the claims based on the Tax Indemnity Agreement was $ 4,308,626 ($ 21,080,373 -$ 16,771,747).

On February 14, 2007, Bankruptcy Judge Sonderby entered an "Order Allowing Claim No. 50863 and Disallowing Claim Nos. 50110, 50111, 50112 and 50113." The order provides in pertinent part:

> IT IS HEREBY ORDERED for the reasons stated in this court's Findings of Fact and Conclusions of Law entered on this date, the amount of claim number 50863 is determined to be $ 4,737,624 and the same is allowed in that amount as an unsecured nonpriority claim, which is entitled to treatment under Class 5 of the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated [*9] Debtors-in-Possession.

> IT IS FURTHER ORDERED that claim numbers 50110, 50111, 50112, and 50113 are disallowed.

(Docket No. 30689).) [1] The same day, Judge Sonderby also issued orders denying Philip Morris's motion in limine to exclude evidence or argument regarding tax savings deductions (Docket No. 30687) and denying Philip Morris's motion for judgment pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52(c) (Docket No. 30685).

> 1    The figure of $ 4,737,624 reflected the $ 4,308,626 portion of the claims under the Tax Indemnity Agreement plus the $ 428,998 portion of the claims under the Participation Agreement.

Philip Morris now appeals from Judge Sonderby's orders [2] and Findings of Fact and Conclusions of Law (Docket No. 30688), and Kmart has filed a cross-appeal from the above-quoted order (Docket No. 30689) and the Findings of Fact and Conclusions of Law. Philip Morris has requested oral argument. The request is denied because after reviewing the briefs, which are very thorough, we do not believe that oral argument will materially add to our understanding of the issues.

2    In addition to the orders described supra, Philip Morris's notice of appeal also includes the bankruptcy court's [*10] order granting Kmart's motion in limine to exclude evidence relating to Kmart's settlement with Verizon (Docket No. 29352). Kmart argued in its motion in limine that Philip Morris should be precluded from using an agreement Kmart entered into to resolve Verizon's claims for the purposes of establishing Kmart's liability on Philip Morris's claims. In Kmart's view, Verizon's claims were completely separate from Philip Morris's claims. The bankruptcy court granted the motion. As far as we can tell, the issues presented for review by Philip Morris in its briefs do not appear to have any relation to the substance of this order, Docket No. 29352. In addition, Philip Morris fails to develop, and therefore waives, any argument as to the order. See Hojnacki v. Klein-Acosta, 285 F.3d 544, 549 (7th Cir. 2002) (a party waives any argument that it fails to develop on appeal).

## DISCUSSION

This court sits as an appellate court for bankruptcy court proceedings. We review the bankruptcy court's factual findings for clear error and its conclusions of law de novo. See In re Smith, 286 F.3d 461, 464-65 (7th Cir. 2002); Fed. R. Bankr. P. 8013. Mixed questions of law and fact are reviewed de novo. Samson v. Alton Banking & Trust Co. (In re Ebbler Furniture & Appliances, Inc.), 804 F.2d 87, 89 (7th Cir. 1986). [*11] Furthermore, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.

Philip Morris raises the following issues for review:

(1) Does the plain language of the TIA permit the $ 16.7 million deduction from Philip Morris's claims for "tax savings"?

(2) Was the $ 16.7 million deduction properly calculated?

(a) Was the deduction for interest expenses proper?

(b) Was the deduction for unamortized transaction expenses proper?

(3) Did the bankruptcy court err by crediting the testimony of Kmart's expert witness, who calculated the deductions?

Kmart's cross-appeal raises the following issues for review:

(1) Did the bankruptcy court err in determining that the Agreed Order precluded Kmart from arguing that Philip Morris's claims were subject to the § 502(b)(6) cap on damages?

(2) Did the bankruptcy court err in holding that in any event the § 502(b)(6) cap did not apply to the claims?

Although Kmart is the cross-appellant, it will be useful to address its arguments first (the same order in which the bankruptcy court addressed these issues).

### A. Preclusion and the § 502(b)(6) Cap

Kmart first contends that the bankruptcy court [*12] erred in determining that Kmart was precluded from arguing that the § 502(b)(6) cap applies to Philip Morris's claims. We find it unnecessary to reach this issue because even assuming arguendo that Kmart should not have been so precluded, we agree with the bankruptcy court that the § 502(b)(6) cap does not apply here.

Section 502, which puts a ceiling on a landlord's claim for damages arising from the termination of a lease, states in relevant part:

### § 502. Allowance of claims or interests

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--

. . .

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--

(A) the rent reserved by such lease, without acceleration, for the greater [*13] of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--

(i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease; without acceleration, on the earlier of such dates . . . .

11 U.S.C. § 502 (emphasis added). Thus, the claim has to be that of a lessor for damages resulting from a lease termination. The purpose of the cap is to allow non-lessor creditors to recover more than they would otherwise receive if the lessor's claim were to be allowed in full, since a lessor's claim can likely be so large as to thwart reorganization efforts, while at the same time allowing a lessor to obtain a reasonable portion of the damages it suffers. In re Goldblatt Bros., Inc., 66 B.R. 337, 346 (Bankr. N.D. Ill. 1986).

It is undisputed that Philip Morris, as an Owner Participant, was not the owner of the properties, nor was it Kmart's lessor; the Owner Trusts were. Yet Kmart urges us, as it did the bankruptcy court, to recognize Philip Morris as the "true lessor" because the Owner [*14] Trusts were pass-through entities for federal tax purposes that "merely act[ed] as property manager." (Kmart's Resp./Cross-Appeal Br. at 28.) Kmart concedes that the "bankruptcy court was correct to say that there is only a 'modicum of case law'" on the issue, id. at 29, but contends that we should regard Philip Morris as the lessor because "in the bankruptcy context courts routinely look through the labels parties attach to transactions to the fundamental economic substance," id. at 27. Kmart relies primarily on the case of In re Southern Cinemas, Inc., 256 B.R. 520 (Bankr. M.D. Fla. 2000), in which the bankruptcy court applied the § 502(b)(6) cap to a claim of a lease assignor for damages resulting from termination of a lease. Even though the assignor was not the lessor, the court considered the distinction to be "meaningless" because the nature of the relationship was such that the assignor of the lease acted as a landlord. 256 B.R. at 536. In Kmart's view, this court should likewise disregard the Owner Trusts' role as lessor as a "mere contrivance . . . to administer the rent payments." (Kmart's Resp./Cross-Appeal Br. at 32.)

In response, Philip Morris maintains that the facts of [*15] the instant case are distinguishable from those of Southern Cinemas and that we should not ignore the separate legal existence of the Owner Trusts, which were properly formed and maintained. According to Philip Morris, Kmart itself sought out, and benefited from, the carefully-planned structured finance transaction at issue here, and there is no reason to rewrite history solely so Kmart can avoid liability for the claims.

Philip Morris's arguments are well taken. We agree with the bankruptcy court that Southern Cinemas is distinguishable because there, the assignor stepped into the shoes of the lessor, who initially held the claims. Here, BONY--not Kmart--became entitled to the lessor claims that were previously held by the Owner Trusts. The claims of Philip Morris, as beneficiary of the Owner Trusts, arose under the TIA and not under the rejected leases as did the BONY claims. We also agree with the bankruptcy court's observation that in order to declare Philip Morris the "true lessor," we would either have to ignore the distinction between the Owner Trusts and Philip Morris as in a veil-piercing situation, or we would have to "recharacterize the entire transaction from an economic [*16] substance argument." Kmart, 362 B.R. at 386. The bankruptcy court stated that it was not inclined to do either; nor are we, especially considering that there is no apposite precedent for ignoring the precise manner in which the parties structured their transaction. We are not persuaded by Kmart's dismissal of the trust structure as a "mere contrivance."

We also agree with the bankruptcy court that even were we to view Philip Morris as the "true lessor," it cannot be said that its claims are "for damages resulting from the termination of a lease" as is required to apply the § 502(b)(6) cap. As the bankruptcy court explained:

The tax indemnity portion of the Claims is related to the Leases in the sense that the Leases are one component in a transaction designed to provide tax deferrals. However, the Claims here do not arise directly from the Leases. Instead, the Claims are based on Claimants' desire to recover lost tax benefits from the transaction should an adverse tax consequence take place, which is not necessarily triggered by termination of the leases.

362 B.R. at 386. The TIA, under which Philip Morris's claims arise, provides that Kmart must indemnify Philip Morris for Income Inclusions [*17] experienced "as a result of . . . any pursuit of remedies . . . following an Event of Default." (R. 2 at 3-4.) The Event of Default, as

Page 5

defined by the Leases, was Kmart's bankruptcy filing. The "pursuit of remedies" that caused the Income Inclusion was BONY's pursuit of remedies for the defaults under the indentures, and, as was demonstrated at the hearing, the deed-in-lieu transaction that occurred in satisfaction of the indebtedness to BONY. Therefore, we agree with the bankruptcy court that Philip Morris's claims were not for damages resulting from the rejection of the leases, but from BONY's pursuit of remedies and the ensuing deeds-in-lieu of foreclosure.

We hold that the prerequisites for applying the § 502(b)(6) cap are not satisfied here. We now move on to the issues raised by Philip Morris in its appeal.

**B. The "Tax Savings" Deductions from Philip Morris's Claims**

The bankruptcy court determined that Philip Morris's tax indemnity claims were subject to a $ 16,771,747 offset. Philip Morris asks us to assign error to this determination. It relies on the language of the TIA, which the parties agree is unambiguous.

The TIA requires Kmart to indemnify Philip Morris in the event that [*18] Philip Morris experienced certain Income Inclusions, also known as "Losses," and that the indemnity is to be calculated "pursuant to either clause (y) or (z)" of § 3 of the TIA. (R. 2 at 3-4.) The parties agreed, and the bankruptcy court accepted, that only clause (z) is applicable here. [3] Clause (z) provides in relevant part as follows:

. . . Kmart shall pay to the Owner Participant as an indemnity a lump-sum amount which, on an After-Tax Basis, shall be sufficient to preserve the Owner Participant's Economics as if such Loss had not occurred. The computation of such lump-sum amount shall be made by the Owner Participant utilizing the methodology and assumptions, including the Tax Assumptions, utilized by the Owner Participant in determining Basic Rent and Termination Value, except as such assumptions shall be varied to take into account such Loss and any prior Loss.

. . . The computation of such lump-sum amount under this clause (z) also shall take into account any past, current and anticipated interest, penalties and additions to tax payable by the Owner Participant as a result of such Loss and any Federal, state or local net income tax benefits reasonably expected to be realized [*19] by the Owner Participant by

reason of the circumstances or adjustments giving rise to such Loss.

(R. 2 at 5-6.) In turn, the phrase "Owner Participant's Economics" is defined as

Owner Participant's nominal after-tax yield, total after-tax cash flow and total [Financial Accounting Standards Board] after-tax lease income for the first five years utilizing the multiple investment sinking fund method of analysis computed on the basis of the same methodology and assumptions as were utilized in the Owner Participant's original calculation of Basic Rent and Termination Value.

(R. 1 at 44.) [4]

3    Clause (y) is a "pay-as-you-go" indemnity provision applicable only "so long as no . . . Event of Default has occurred." (R. 2 at 4.)
4    The TIA provides that capitalized terms used but not defined therein (such as Owner Participant's Economics) shall have the meanings assigned to them in the Purchase Agreement, the Participation Agreement, and the Leases. (R. 2 at 1-2.) The Participation Agreement contains the definition of "Owner Participant's Economics."

Philip Morris contends that because the indemnity provision requires that Philip Morris's "economics" be preserved as if the income inclusion had not occurred, [*20] and because "economics" includes the concept of after-tax cash flow, the bankruptcy court erred by not taking into account that the circumstances giving rise to the income inclusion also gave rise to the loss of free cash that was factored into the structured transaction in order to pay the future taxes. In other words, Philip Morris's position is that the bankruptcy court erred in applying the "tax savings" credits because, given that Philip Morris expected future cash flows sufficient to cover the income taxes, Philip Morris enjoyed no net benefit from the elimination of the remaining future taxes.

The bankruptcy court rejected Philip Morris's argument, relying on Bankruptcy Judge Wedoff's reasoning in the case of In re UAL Corp., 346 B.R. 783 (Bankr. N.D. Ill. 2006), in which the court was presented with a similar leveraged lease transaction and tax indemnity agreement. In UAL, General Foods, an "Owner Participant," had lost the free cash it expected to receive from the transaction as a result of United Airlines's default and the indenture trustee's foreclosure on the aircraft involved. General Foods argued that in order to protect its

"Net Economic Return," the court should account [*21] for General Foods's loss of free cash against the anticipated tax savings and thus make no reductions to the indemnity for the tax savings. Judge Wedoff disagreed and found that the concept of "Net Economic Return" could not be interpreted to increase the tax indemnity claim beyond the net change in tax consequences. 346 B.R. at 788. The district court affirmed Judge Wedoff's decision, stating that "General Foods' interpretation . . . transforms the TIA's purpose from indemnifying General Foods for the loss of certain tax benefits to indemnifying General Foods for the loss of Net Economic Return. This is inconsistent with the parties' manifest intent in the TIA." General Foods Credit Corp. v. United Air Lines, Inc. (In re UAL Corp.), No. 06 C 4243, 2007 U.S. Dist. LEXIS 5422, 2007 WL 256323, at *4 (N.D. Ill. Jan. 22, 2007).

We reject Philip Morris's argument, which is identical to that of General Foods in UAL, for the same reasons. Philip Morris's attempt to distinguish UAL is unavailing because it fails to explain why the minute factual differences between the cases are material. Moreover, Philip Morris does not present a commonsense interpretation of the TIA; it pulls the concept of "after-tax cash flow" wholly [*22] out of context, and its position that there is no net tax benefit because the taxes "never would have been a burden" due to the free cash is unpersuasive. [5] The TIA was intended to indemnify Philip Morris strictly for adverse tax consequences, not for all adverse consequences resulting from a premature termination of the transaction. Accordingly, we agree with the bankruptcy court that the TIA permitted "tax savings" deductions from Philip Morris's claims.

> 5   The argument is likewise rejected to the extent that it is relied on as a basis for the contention that tax savings deduction for accrued interest was inappropriate.

## C. The Calculation of the "Tax Savings" Deductions and Kmart's Expert Witness

Philip Morris's first objection to the manner in which the bankruptcy court calculated the tax savings offset is that the court "erroneously treated" the three categories of offsets that Kmart sought "as calling for only a single determination." (Philip Morris's Opening Br. at 17.)

The bankruptcy court separately identified and explained each of the offsets that Kmart sought:

> Kmart identifies three types of tax savings. First, Kmart argues that the present value of the taxes that [Philip Morris] [*23] would have had to pay on the income related to the Indentures had the

transaction run its course must be reduced from the tax indemnity amount. Second, the amount should be further reduced by the benefit [Philip Morris] gained from the accelerated deductibility of the transaction expenses, ordinarily amortized over the life of the transaction, caused by the premature ending of the transaction. Finally, the indemnity amount should be reduced by the amount of deductions relating to the accrued but unpaid interest on the Indentures.

362 B.R. at 389 (citations to the record omitted). The court then stated that it would "collectively refer to these three asserted reductions as the Tax Savings," and grouped the items together for further discussion. Id.

Philip Morris's position appears to be that the bankruptcy court was required to analyze each item separately and in detail to determine whether each item constituted "tax savings" and was therefore deductible from the indemnity. Philip Morris's companion argument is that the bankruptcy court erroneously relied on Kmart's expert witness, Isaac Sperka, who calculated the tax savings items. The objection is not that Sperka's testimony at the [*24] hearing was inadmissible, but that it was not entitled to "any weight" as to two of the three tax savings items because "Sperka gave the court nothing but his bottom line"--"no supporting methodology or analysis." (Philip Morris's Combined Resp. and Reply Br. at 27-28.)

Mr. Sperka testified that he is a tax lawyer employed by Ernst & Young as a specialist in leveraged lease transactions. It is clear from our review of his testimony that, as the bankruptcy court found, he is well-versed in the tax consequences of leveraged lease transactions. It is also clear that, contrary to Philip Morris's assertion, Mr. Sperka supplied the bases for his calculations and thus more than merely a "bottom line." As the bankruptcy court explicitly found:

> Here, Sperka did not just give a naked opinion of what he thought was the amount of the Tax Savings. In arriving at his opinion, Sperka and his colleague consulted [Philip Morris's] ABC Pricing Files, which were admitted into evidence. The ABC Pricing Files contained information such as the depreciation applied to the properties, the interest rates on the Indentures, the amount of third-party debt involved, and the equity and fees invested by [Philip Morris].  [*25] Sperka also re-

viewed the tax returns and the damage model prepared by [Philip Morris], which are also in evidence. Finally, he testified concerning the inferential processes he used in reaching his conclusion. Therefore, and given his established and unquestioned expertise in this area, the court finds Sperka's opinion useful and of sufficient weight.

362 B.R. at 391 (citations to the record omitted). The bankruptcy court also noted that Philip Morris offered no alternative amounts for the Tax Savings, expressed no problems with the Tax Savings calculations, and withdrew its objection to the lack of support for Mr. Sperka's calculations. See id. Indeed, when cross-examined about the calculation of the two items of Tax Savings at issue here, Philip Morris's own witness, its in-house tax counsel Richard Mahoney, endorsed Mr. Sperka's mathematical calculations. (R. 140 at 102 ("I wasn't able to verify it dollar for dollar, but it was close enough for me"); R. 140 at 124 ("I was able to check [Mr. Sperka's] math. . . . I agree with the math.").

Philip Morris's argument is essentially that Mr. Sperka was required to "show his work" mathematically. We disagree. Neither of the cases cited by [*26] Philip Morris supports the proposition that Mr. Sperka was required to describe every step of his calculations; they merely stand for the proposition that an expert must provide factual bases and reasons for an opinion. See

Kenosha Liquor Co. v. Heublein, Inc., 895 F.2d 418, 420 (7th Cir. 1990); Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago, 877 F.2d 1333, 1339 (7th Cir. 1989). Mr. Sperka explained the bases for his calculations and the documents and processes he used. Accordingly, it was entirely reasonable for the bankruptcy court to have relied on Mr. Sperka's calculations, especially given the absence of any contrary evidence and given that Philip Morris's own witness *agreed* with the computations.

We also reject the contention that the bankruptcy court was required to discuss each of the items of Tax Savings separately. Mr. Sperka testified at length about each item and why each constituted Tax Savings. He also testified on cross-examination regarding why he would not apply a "present value" analysis to the deduction for unamortized fees, which Philip Morris now contends should have been applied. The bankruptcy court found Mr. Sperka's opinions useful and persuasive. [*27] Mr. Sperka's testimony was a clear basis on which the bankruptcy court could conclude that the three items all constituted Tax Savings.

## CONCLUSION

For the foregoing reasons, the bankruptcy court's Findings of Fact and Conclusions of Law and related orders of February 14, 2007 are affirmed.

DATE: October 24, 2007

John F. Grady, United States District Judge

LEXSEE

**IN RE: ASTROLINE COMMUNICATIONS COMPANY, LIMITED PARTNER-
SHIP, Debtor. MARTIN W. HOFFMAN, Trustee, Plaintiff-Appellant, - v. - AS-
TROLINE COMPANY, ASTROLINE COMPANY, INC., and ASTROLINE CON-
NECTICUT, INC., Defendants-Appellees.**

**No. 96-5006**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**1996 U.S. App. LEXIS 24940**

**September 13, 1996, Decided**

**NOTICE:**      [*1]  RULES OF THE SECOND CIR-
CUIT COURT OF APPEALS MAY LIMIT CITATION
TO UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**     Reported in Table Case
Format at: 104 F.3d 350, 1996 U.S. App. LEXIS 38092.

**PRIOR HISTORY:**     Appeal from the United States
District Court for the District of Connecticut. (Arterton,
J.). This cause came on to be heard on the transcript of
record from the United States District Court for the Dis-
trict of Connecticut and was argued.

**DISPOSITION:**     AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff bankruptcy trus-
tee sought review of the dismissal of his complaint by
the United States District Court for the District of Con-
necticut in plaintiff's action under 11 U.S.C.S. § 554(b),
seeking to avoid debtor's transfer of an option, a deposit,
and the zoning rights to defendant property transferee.
Plaintiff contended that the transfer was both construc-
tively and actually fraudulent under Connecticut law.

**OVERVIEW:** Plaintiff bankruptcy trustee sought re-
view of the dismissal of his action under 11 U.S.C.S. §
554(b), seeking to avoid debtor's transfer of an option, a
deposit, and the zoning rights to defendant property pur-
chaser. Plaintiff contended that the transfer was both
constructively and actually fraudulent. The court af-
firmed the dismissal and held that the fact that appellees
invested substantial money in debtor which could have,

in turn, been used to pay creditors, was sufficient proof
that defendant did not intend to defraud its creditors.
Plaintiff contended that the transfer was constructively
fraudulent because debtor received only a 90-day lease,
with an estimated value of $ 14,000 per month, in ex-
change for the option, the deposit, and the zoning rights.
The court could not hold that this amount was not less
than "substantial consideration" for the debtor's transfer
to defendant. The only reasonable interpretation of the
lease was that it was for an original three-year term, and
only thereafter terminable on 90 days' notice. The bank-
ruptcy court's conclusion that defendant did not have an
actual fraudulent intent was not clearly erroneous.

**OUTCOME:** The judgment of dismissal of plaintiff
bankruptcy trustee's complaint seeking to avoid debtor's
transfer of an option, a deposit, and the zoning rights to
defendant property transferee was affirmed because the
fact that defendant invested substantial money in debtor
which could have, in turn, been used to pay creditors,
was sufficient proof that defendant did not intend to de-
fraud bankruptcy creditors.

**CORE TERMS:** lease, tower, deposit, fraudulent, zon-
ing, fraudulent intent, constructively, conveyance, televi-
sion broadcast, termination provision, notice, state law,
applicable law, constructive fraud, actual fraud, de novo,
clear error, option to purchase, put down, automatically,
transferred, renewalbe, commence, invested, build,
comma, site

**COUNSEL:** FOR APPELLANT: Martin W. Hoffman,
Hartford, CT.

FOR APPELLEES: Robert A. Izard, Jr., Robinson &
Cole, Hartford, CT.

**JUDGES:** PRESENT: HONORABLE WILFRED FEINBERG, HONORABLE RICHARD J. CARDAMONE, HONORABLE JOSEPH M. McLAUGHLIN, Circuit Judges.

**OPINION**

**SUMMARY ORDER**

ON CONSIDERATION WHEREOF, it is hereby ordered, adjudged, and decreed that the judgment of the district court be and it hereby is AFFIRMED.

Astroline Communication Company Limited Partnership ("Debtor") formerly operated a television broadcasting station in Hartford, Connecticut, and owned a television broadcast tower located on real property at 580 Deercliff Road, Avon, Connecticut ("580 Deercliff"). To increase its broadcast power, Debtor required a larger tower. When the local Zoning Board denied Debtor permission to build a larger tower at 580 Deercliff, Debtor was forced to look for an alternative site. Debtor obtained an option to purchase [*2] a ninety-acre parcel at 376 Deercliff Road, Avon and West Hartford, Connecticut ("376 Deercliff"), for $ 900,000. Debtor put down a $ 100,000 partially refundable deposit in consideration for the option, and later put down an additional $ 30,000 deposit to extend the option.

Debtor never purchased 376 Deercliff. Rather, it transferred the option to Astroline Company ("Astroline"), and Astroline purchased the property. Astroline used Debtor's $ 130,000 deposit in making the purchase. Astroline then leased the property to Debtor, so that Debtor could construct its desired television broadcast tower on the land. Also, Debtor "gave up" its zoning rights at 580 Deercliff -- completely removing its old tower from that site -- to obtain authority to build the larger tower at 376 Deercliff (which was owned by Astroline).

Thus, in the entirety of the transaction, Debtor "transferred" to Astroline: (1) the option to purchase 376 Deercliff; (2) the $ 130,000 deposit; and (3) the zoning rights to allow construction of a television broadcast tower. Astroline, in turn, gave Debtor the lease on the property. The lease states:

The term of this Lease shall be for three (3) years, and shall [*3] commence from the date of this Lease and be automatically renewalbe [sic] for one (1) year periods thereafter unless terminated by ninety (90) days written notice by either party.

The yearly rent under the lease was $ 10. Debtor actually possessed 376 Deercliff, under the lease, for over six years.

Debtor is now the subject of Chapter 7 liquidation proceedings in the United States Bankruptcy Court for the District of Connecticut (Robert L. Krechevsky, *Chief Bankruptcy Judge*). Martin Hoffman is the bankruptcy trustee. Hoffman brought an action in the bankruptcy court, pursuant to 11 U.S.C. § 554(b), seeking to avoid Debtor's transfer of the option, the deposit, and the zoning rights to Astroline. Hoffman argued that the transfer was both constructively and actually fraudulent under Connecticut law. The bankruptcy court found that the transfer was not fraudulent, and dismissed the complaint. The United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*) affirmed. Hoffman now appeals, renewing his arguments that the transfer was constructively and actually fraudulent.

The Bankruptcy Code provides that "the trustee may avoid any transfer [*4] of an interest in property or any obligation incurred by the debtor that is voidable under applicable law . . . ." 11 U.S.C. § 544(b). Generally, "applicable law" means state law. *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809 (9th Cir. 1994). Under Connecticut state law:

A party who seeks to set aside a conveyance as fraudulent bears the burden of proving that the conveyance was made without substantial consideration and that, as a result, the transferor was unable to meet his obligations (constructive fraud) or that the conveyance was made with fraudulent intent in which the transferee participated (actual fraud).

*Tessitore v. Tessitore*, 31 Conn. App. 40, 42, 623 A.2d 496, 498 (1993), citing *Tyers v. Coma*, 214 Conn. 8, 570 A.2d 186 (1990).

*1. Constructive Fraud.* Hoffman argues that the transfer was constructively fraudulent because Debtor received only a ninety-day lease in exchange for the option, the deposit, and the zoning rights. We disagree. The only reasonable interpretation of the lease is that it was for an original three-year term, and only thereafter terminable [*5] on ninety days' notice.

In assessing a bankruptcy court's interpretation of a contract, we review its textual interpretation *de novo*, *see*

*Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910, 912 (2d Cir. 1990), but its findings regarding extrinsic evidence only for clear error, *see Network Publishing Corp. v. Shapiro*, 895 F.2d 97, 99 (2d Cir. 1990).

Hoffman urges that the ninety-day termination provision must apply to both the automatic renewals *and* the initial three-year period because "there is no comma or other punctuation separating the clause 'and shall commence from the date of this Lease' from 'and be automatically renewalbe [sic] for one year periods thereafter.'" However, a comma clearly separates the ninety-day termination provision from the crucial three-year term provision.

Furthermore, Debtor's managing general partner testified that the Debtor-Astroline deal "was done on the basis that [Debtor] would get a long-term favorable lease for [its] tower" as a "quid pro quo kind of exchange." The bankruptcy court did not clearly err when it found that this testimony supported Astroline's interpretation -- that the initial three-year [*6] term is unaffected by the termination provision.

Testimony established that the value of the lease was estimated at $ 14,000 per month. Over three years, then, the value to Debtor of its essentially rent-free occupancy of 376 Deercliff was over $ 500,000. Whether under a clearly erroneous or *de novo* standard of review, *see Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 481 (4th Cir. 1992) ("in reviewing a decision concerning reasonably equivalent value for fraudulent transfers, the courts are split" as to the appropriate standard), we cannot say that this amount is less than "substantial consideration" for the Debtor's transfer of the option, deposit, and zoning rights to Astroline.

*2. Actual Fraud.* Hoffman also argues that the district court erred in finding that Astroline did not have fraudulent intent with respect to the Debtor-Astroline exchange. Again, we disagree.

We review a bankruptcy court's findings regarding a party's actual fraudulent intent only for clear error. *See Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 307 (11th Cir. 1994); *Acequia*, 34 F.3d at 805.

After the exchange took place, [*7] Astroline allowed Debtor to retain possession of 376 Deercliff for over six years, despite its right to terminate the lease on ninety days' notice after the initial three-year term. And, during this period, Astroline invested approximately $ 20,000,000 in Debtor. The bankruptcy court's conclusion, based upon this evidence, that Astroline did not have an actual fraudulent intent is not clearly erroneous. As the district court noted, "the fact that appellees invested [substantial] money in [Debtor] which could, in turn, be used to pay creditors is sufficient proof that [Astroline] did not intend to defraud those creditors."

We have considered all of the arguments raised by Hoffman, and find them to be without merit.

Accordingly, the decision of the district court is AFFIRMED.

Date signed November 09, 2005



**PAUL MANNES**
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

IN RE:                                      :
                                            :
NATIONAL ENERGY & GAS           :    Case No. 03-30459PM and
  TRANSMISSION (f/k/a PG&E       :    03-30461PM through 02-30464PM
  NATIONAL ENERGY GROUP, INC.),  :        (Jointly Administered Under
  et al.                        :         Case No. 03-30459PM)
                    Debtors      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - :

### MEMORANDUM OF DECISION

On January 27, 2005, the Debtors filed Objections to the proofs of claims filed by various

Attala entities. The proofs of claim objected to include: claims numbered 309 and 631 filed by

VCC Attala OP LLC and claims numbered 304 and 630 filed by TCC Attala OP LLC (together,

the "Owner Participants"); claims numbered 308 and 629 filed by BATCL-1987 II, Inc. and

claims numbered 306 and 628 filed by Newcourt Capital USA, Inc. (together, the "Sole

Owners"); and claim number 307 filed by TCC Attala OL LLC and claim number 305 filed by

VCC Attala OL LLC (together, the "Owner Lessors"). Collectively, the parties refer to the

Owner Participants, Sole Owners and Owner Lessors as the "Attala Owner Entities." The Attala

Owner Entities responded to the objections to claims, and as part of that response, moved for

partial summary judgment.  Following a hearing on the objections to claims, held on August 11, 2005 and August 12, 2005, the court issued a tentative ruling, and requested that the parties submit additional memoranda.  The Debtors and the Attala Owner Entities each filed memoranda and responses.  Upon consideration of the additional memoranda, as well as the previous filings and hearings, the court has determined to sustain the Debtors' objections to the claims of the Owner Lessors and Sole Owners, and overrule, in part, the Debtors' objections to the Owner Participants' claims, and allow the claims in a reduced amount as detailed below.

In their objections to the Attala Owner Entities' claims, the Debtors argue that the claims of the Owner Lessors and Sole Owners should be disallowed.  Also, they argue and that the claims of the Owner Participants should be disallowed, but in the alternative, allowed in the reduced amounts of $6,085,505 for the VCC Attala OP LLC claim (claim number 631) and $1,520,876 for the TCC Attala OP LLC claim (claim number 630).[1]  The Attala Owner Entities provided little, or no response to the arguments regarding the claims of the Owner Lessors and Sole Owners.  As to the objections to the claims of the Owner Participants, the Attala Owner Entities argued that the claims should be allowed in full, as filed, and initially disputed any suggestion that the claims be reduced, but in later filings, accepted, with reservation, the argument that a discount rate was applicable to the Owner Participants' claims.

As background, in 2002, Attala Generating Company, a subsidiary of the debtor, was sold to the Owner Lessors.[2]  The Owner Lessors then leased back the generating facility to Attala

---

[1] The Debtors request that claims number 309 and 304, filed by VCC Attala OP LLC and TCC Attala OP LLC, respectively, be disallowed as superceded by claims numbers 631 and 630, referenced above.

[2] The purchase of Attala Generating by the Owner Lessors was funded, in part, by their equity owners, the Owner Participants.  BATLC-1987 II and Newcourt Capital USA were the sole owners of the Owner Participants.

Generating.  Attala Generating eventually defaulted on the lease payments, and the generating facility was sold at a foreclosure sale.

As part of the sale/leaseback transaction, the parties entered into a number of agreements. The relevant agreements for these objections to claims include: (1) a tax indemnity agreement; (2) an indemnity guarantee; (3) a participation agreement and (4) a tolling agreement guaranty. The tax indemnity agreement was entered into between Attala Generating, the Owner Participants and the Sole Owners.  The indemnity guarantee was entered into between NEGT and the Owner Participants, and guaranteed Attala Generating's payments under the tax indemnity agreement and participation agreement.  Under the tolling guaranty, NEGT guaranteed Attala Energy Company, LLC's (a non-filing subsidiary of the debtors) toll payments to Attala Generating.

With regard to the objections to the claims of the Owner Lessors and Sole Owners, the Debtors argue that neither group is entitled to payment under any of the documents at issue here. The Owner Lessors' claim are under the Tolling Guaranty, and the Debtors' argue that all claims under the Tolling Guaranty were settled as part of an April 2004 compromise entered into in this bankruptcy case.  As to the Sole Owners, the Debtors argue that they seek payment under an Indemnity Guaranty, and that the Sole Owners are not parties to the Indemnity Guaranty, and thus have no right to assert a claim under the agreement.  The Attala Owner Entities offered little to no argument in response to these assertions by the Debtors.  Based upon the objections to claims and the relevant documents submitted in support thereof, responses and argument at the hearings, the court has determined to sustain the Debtors' objections to the claims Owner Lessors and Sole Owners, claims numbered 308, 629, 306, 628, 307 and 305.

As to the objections to the claims of the Owner Participants, the Debtors argue that any

claims of the Owner Participants arise under the tax indemnity agreement, and request that the

claims be disallowed, or allowed in reduced amounts. The Debtors argue that the Owner

Participants' claims should be limited to their lost tax benefits under the tax indemnity

agreement, as this was the intention of the parties in entering into the agreement. The Attala

Owner Entities argue that the Owner Participants' claims arise under the tax indemnity

agreement and participation agreement (and indemnity agreement), and that the claims should be

allowed as filed. They further argue that the plain language of the tax indemnity and

participation agreements supports their claims.

    The total amount sought by the Owner Participants is $240,091,351; VCC Attala OP filed

a proof of claim in the amount of $192,073,089 and TCC Attala OP filed a proof of claim in the

amount of $48,018,272. As noted above, the Debtors argue that these claims should either be

disallowed or reduced to $6,085,505 and $1,520,826, respectively.

    The court has determined to allow the Owner Participants' claims, but at a reduced

amount. The tax indemnity agreement provides that the Owner Participants are entitled to

certain United States federal, state and local income tax benefits, and, under the agreement,

Attala Generating "agreed to indemnify the Owner Participant[s] under certain circumstances for

the loss of such benefits." The tax indemnity agreement further provides that in certain

circumstances, Attala Generating will pay to the Owner Participants a lump sum amount that

"shall be sufficient to preserve Owner Participant's Net Economic Return . . . ." The parties do

not dispute that the foreclosure triggered Attala Generating's obligation under the tax indemnity

agreement to indemnify the Owner Participants. Nor do the parties disagree that by virtue of the

indemnity guarantee, NEGT is liable to the Owner Participants as NEGT guaranteed Attala

Generating's payments under the tax indemnity agreement.

The question is, therefore, how much is owed to the Owner Participants under the tax indemnity agreement. The agreement specifically provides that if certain events occur, such as what happened here, Attala Generating will pay to the Owner Participants a lump sum payment in an amount sufficient to preserve the Owner Participants' "net economic return." The term "net economic return" is not defined in the tax indemnity agreement, but is defined in the participation agreement. The two agreements were entered into in connection with the same transaction, and while the tax indemnity agreement does not refer to the participation agreement, the definition provided in the participation agreement should apply.

Per the participation agreement, "net economic return" is defined as: "(a) the Owner Participant's anticipated net after-tax yield, calculated according to the multiple investment sinking fund method analysis, and (b) aggregate GAAP income and after-tax cash flow." The Attala Owner Entities argue that using this formula, their claims total $240,091,351. They further argue that in the alternative, if a discount rate is necessary, a rate of 2.58 percent is appropriate, reducing the total amount of their claims to $178,983,599. The Debtors, as noted above, principally argue that the claims should be reduced to cover actual lost tax benefits only, and do not submit their own calculation of the amount of the Owner Participants' net economic return. The Debtors, submit that the Owner Participants' claim should be subject to a discount rate of 12 percent, resulting in a claims total of $48,753,903.

Under 11 U.S.C. §502(b), if an objection to claim if filed, the court must determine the amount of such claim as of the date of the filing of the petition. In In re U.S. Airways, Inc., 303 B.R. 784, 793 (Bankr. E.D. Va. 2003), the court, in deciding an objection to the claim of the Pension Benefit Guaranty Corporation, noted as follows:

> In fixing the amount of a claim 'as of the date of the filing of the petition,' there is no dispute that the court must discount future damages to present value. . . . Thus,

> if [the creditor] held merely a common-law indemnity claim . . . there can be little
> doubt that this court would have full authority to determine an appropriate
> discount rate"

U.S. Airways, 303 B.R. at 793.  The Court has determined to accept the Debtors' proposed 12

percent discount rate, based upon the Debtors' argument regarding the risk involved with the

Owner Participants' investment.  Therefore, the Owner Participants' claims will be allowed in a

total amount of $48,753,903; or $9,750, 780 to the TCC Attala OP claim and $39,003,123 to the

VCC Attala OP claim.

An appropriate order will be entered.

**End of Memorandum of Decision**