**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                         :

**BELL ATLANTIC TRICON LEASING**      :
**CORPORATION, NCC GOLF COMPANY,**  :
**NCC KEY COMPANY and NCC CHARLIE**  :   **Civil Case No. 08-CV-2449 (RMB)**
**COMPANY,**                               :   **(ECF Case)**
                                         :
                     **Appellants,**       :
                                         :
                    **-against-**         :
                                         :
**DELTA AIR LINES, INC.,**             :
                                         :
                     **Appellee.**        :

-------------------------------------------------------------x


# BRIEF ON APPEAL OF APPELLEE
# DELTA AIR LINES, INC.


DEBEVOISE & PLIMPTON LLP
Michael E. Wiles
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
email: mewiles@debevoise.com

*Attorneys for Delta Air Lines, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ......................................................................................... 1

COUNTER-STATEMENT OF ISSUE PRESENTED .................................................. 1

STANDARD OF APPELLATE REVIEW ....................................................................... 1

STATEMENT OF THE CASE ........................................................................................... 2

     A.    The Verizon Transactions ............................................................................ 2

     B.    Decisions on Prior Test Cases ..................................................................... 2

     C.    The Objection to Verizon's Claims and Verizon's Responses ........................ 4

     D.    Oral Argument Before The Bankruptcy Court ................................................. 5

     E.    The January 16 Decision ............................................................................... 6

ARGUMENT ........................................................................................................................ 7

I.     DELTA'S ALLOWANCE AND DISCHARGE OF SLV CLAIMS
      SATISFIES AND DISCHARGES, IN FULL, DELTA'S OBLIGATION TO
      PAY SLV .......................................................................................................... 7

II.    THE TAX INDEMNITY AGREEMENTS DO NOT REQUIRE THE
      PAYMENT OF SLV "IN CASH," AND EVEN IF THEY DID SUCH
      PROVISIONS WOULD BE SUPERSEDED BY FEDERAL BANKRUPTCY
      LAW ................................................................................................................... 9

III.   THE BANKRUPTCY COURT'S DECISION IS CONSISTENT WITH THE
      SUPREME COURT DECISION IN *TRAVELERS*.......................................... 11

IV.   NO EXTRINSIC EVIDENCE IS NECESSARY OR ADMISSIBLE ......................... 13

     A.    Verizon's Argument About The Alleged Purpose Of Section 7 Is
         Inconsistent With The Plain Language Of The Contracts ........................... 13

     B.    The Bankruptcy Court Did Not Err By Consulting Dictionary
         Definitions ................................................................................................ 14

     C.    The TIAs Plainly Bar Verizon's Claims ..................................................... 15

     D.    Section 7 Does Not Use Specialized Industry Terminology ..................... 15

     E.    The Bankruptcy Court Properly Excluded Extrinsic Evidence ..................... 17

V.      VERIZON'S ARGUMENT THAT SLV MUST BE PAID WITHOUT
        OFFSETS FOR OTHER DAMAGE RECOVERIES IS WITHOUT MERIT ......... 18

        A.      Applicable Law Treats Other Damage Recoveries As Payments Of
                SLV .................................................................................................. 18

        B.      The Leases Treat FMV And Other Recoveries As "Payments" Of SLV ....... 19

        C.      Verizon's Interpretation Would Deprive Section 7 Of The TIA Of
                Meaning And Would Render It A Nullity ......................................................... 19

        D.      Verizon's Interpretation Makes No Sense ......................................................... 21

VI.     ALTERNATIVELY, THE ORDER SHOULD BE AFFIRMED BECAUSE
        THE LAW REQUIRES THE DISALLOWANCE OF DUPLICATIVE
        CLAIMS, REGARDLESS OF WHAT THE CONTRACTS SAY ............................ 22

CONCLUSION ............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Alexander & Alexander Services, Inc. v. Lloyd's*,
  136 F.3d 82 (2d Cir. 1998)..................................................................................17 n. 4

*Beals v. The Home Insurance Co.*,
  36 N.Y. 522 (1867) ..........................................................................................8

*Citadel Equity Fund, Ltd. v. Aquila, Inc.*,
  371 F. Supp. 2d 510 (S.D.N.Y. 2005).............................................................14

*Corhill Corp. v. S.D. Plants, Inc.*,
  176 N.E.2d 37 (N.Y. 1961) ..............................................................................21

*Diversified Graphics, Ltd. v. Groves*,
  868 F.2d 293 (8th Cir. 1989)............................................................................22

*Farmers and Citizens Bank v. Sherman*,
  33 N.Y. 69 (1865) ............................................................................................10

*Frank Nero Auto Lease, Inc. v. Townsend*,
  411 N.E.2d 507 (Ohio Ct. App. 1979) .............................................................18

*Garza v. Marine Trans. Lines Inc.*,
  861 F.2d 23 (2d Cir. 1988)...............................................................................17 n. 4

*Havel v. Kelsey-Hayes Co.*,
  445 N.Y.S.2d 333 (App. Div. 1981) ................................................................17

*In re Ames Department Stores, Inc.*,
  1995 WL 311764 (S.D.N.Y. May 18, 1995) ...................................................11

*In re Chateaugay Corp.*,
  115 B.R. 760 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991)
  *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809
  (S.D.N.Y. June 16, 1993) .................................................................................23

*In re Chateaugay Corp.*,
  116 B.R. 887 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991)
  *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809
  (S.D.N.Y. June 16, 1993) .................................................................................17 n. 4

i

*In re Drexel Burnham Lambert Group*,
   138 B.R. 687 (Bankr. S.D.N.Y. 1992) ....................................................................11

*In re Delta Air Lines, Inc.*,
   370 B.R. 552 (Bankr. S. D. N.Y. 2007) .....................................................................3

*In re Delta Air Lines, Inc.*,
   381 B.R. 57 (Bankr. S.D.N.Y. 2008) .........................................................................2

*In re Enron Corp.*,
   364 B.R. 482 (S.D.N.Y. 2007) ...................................................................................1

*In re Enron Creditors Recovery Corp.*,
   370 B.R. 64 (Bankr. S.D.N.Y. 2007), *rev'd on other grounds*,
   380 B.R. 307 (S.D.N.Y. 2008).................................................................................14

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
   160 B.R. 882 (Bankr. S.D.N.Y. 1993) ........................................................... 11, 22-23

*In re Fobian*,
   951 F.2d 1149 (9th Cir. 1991) .................................................................................12

*In re Keck, Mahin & Cate*,
   241 B.R. 583 (Bankr. N. D. Ill. 1999) ........................................................................8

*In re Northwest Airlines Corp.*,
   Case No. 05-17930 (Bankr. S.D.N.Y. July 27, 2007) ..............................................5, 8

*In re Simetco, Inc.*,
   No. 93-61772, 1996 WL 651001 (Bankr. N.D. Ohio Feb. 15, 1996) .......................23

*In re T.R. Acquisition Corp.*,
   309 B.R. 830 (S.D.N.Y. 2003) ...........................................................................23-24

*In re UAL Corp.*,
   Case No. 02 B 48191 (Bankr. N.D. Ill. July 26, 2005)...........................................8-9

*International Multifoods Corp. v. Commercial Union Insurance Co.*,
   309 F.3d 76 (2d Cir. 2002)..............................................................................16 n. 4

*In the Matter of Brinke Transportation., Inc.*,
   No. 87-03785, 1989 WL 233147 (Bankr. D.N.J. Jan. 23, 1989) ..............................23

*In the Matter of Estate of Gray*,
   290 N.Y.S. 603 (App. Div. 1936)...............................................................................8

*Kates v. Yeshiva University,*
    227 N.Y.S.2d 718 (Sup. Ct. 1962) ..................................................................17

*Levine v. Ribicoff,*
    201 F.Supp. 692 (S.D.N.Y. 1962) ...............................................................8 n. 3

*Mazzola v. County of Suffolk,*
    533 N.Y.S.2d 297 (App. Div. 1988) ..............................................................14

*Ogden v. Saunders,*
    25 U.S. 213 (1827) ..........................................................................................11

*Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Insurance Co.,*
    472 F.3d 33 (2d Cir. 2006) ...................................................................16-17 n .4

*P.G. Lake, Inc. v. Commissioner of Internal Revenue,*
    148 F.2d 898 (5th Cir. 1945) ......................................................................8 n. 3

*Raleigh v. Illinois  Department of Revenue,*
    530 U.S. 15 (2000) ...................................................................................11, 12

*Reape v. New York News, Inc.,*
    504 N.Y.S.2d 469 (App. Div. 1986) ..............................................................22

*R/S Associates. v. New York Job Development Authority,*
    98 N.Y.2d 29 (2002) .......................................................................................14

*Ruttenberg v. Davidge Data Systems Corporation,*
    626 N.Y.S.2d 174 (App. Div. 1995) ..............................................................15

*Sayers v. Rochester Telephone Corp. Supplemental Management. Pension Plan,*
    7 F.3d 1091 (2d Cir. 1993) .......................................................................16 n. 4

*Schmidt v. Magnetic Head Corp.,*
    468 N.Y.S.2d 649 (App. Div. 1983) ..............................................................17

*Scotto v. Brink's, Inc.,*
    962 F.2d 225 (2d Cir. 1992) ......................................................................8 n. 3

*Siletz Trucking Co. v. Alaska Internationall Trading Co.,*
    467 F.2d 961 (9th Cir. 1972) .........................................................................18

*Southwest Park Outpatient Surgery, Ltd. v. Chandler Leasing Division,*
    572 S.W.2d 53 (Tex. Civ. App. 1978) ...........................................................18

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*,
  127 S. Ct. 1199 (2007) ......................................................................................... 10-12

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Associates*,
  472 N.E.2d 315 (N.Y. 1984) ....................................................................................21

*Union Trust Co. of Rochester v. Willsea*,
  9 N.E.2d 820 (N.Y. 1937) ..........................................................................................9

*World Trade Center Properties L.L.C. v. Hartford Fire Insurance Co.*,
  345 F.3d 154 (2d Cir. 2003), *overruled in part on other grounds*
  *sub nom. Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303 (2006) ...........16 n. 4

*Zion v. Kurtz*,
  405 N.E.2d 681 (N.Y.1980) .....................................................................................17

## Statutes and Rules

11 U.S.C. § 101(5) ............................................................................................7, 13, 24

11 U.S.C. § 502...................................................................................................13, 24

11 U.S.C. § 524 ....................................................................................................7, 9

11 U.S.C. § 1141..................................................................................................7

FED. R. BANKR. P. 8013 ..........................................................................................1

## Other

BLACK'S LAW DICTIONARY 1165 (8th ed. 2004) .......................................................10

Appellee Delta Air Lines, Inc. ("**Delta**") submits this brief in response to the appeal by Bell Atlantic Tricon Leasing Corporation, NCC Golf Company, NCC Key Company and NCC Charlie Company (collectively, "**Verizon**") from the Bankruptcy Court's February 7, 2007 "Order with Respect to Substitute TIA/SLV Objection 3" (the "**Order**") [D 35].[1]

## PRELIMINARY STATEMENT

This appeal arises out of eight "leveraged lease" financings. Verizon set up trusts (the "**Owner Trusts**") to buy aircraft, and Delta entered into leases ("**Leases**") with the Owner Trusts. The Owner Trusts then assigned the Leases to indenture trustees ("**Indenture Trustees**") as collateral for loans. If a default occurs, the Leases entitle the Lessors (or the Indenture Trustees as assignees) to a minimum recovery known as "Stipulated Loss Value" ("**SLV**").

Delta also entered into tax indemnity agreements ("**TIAs**") in which Delta indemnified Verizon against certain tax losses. Verizon has agreed that the SLV calculations already include the amount needed to compensate Verizon for tax losses upon a Lease default. The TIAs address this duplication by providing that no TIA claim exists if Delta "is required to pay Stipulated Loss Value or Termination Value, to the extent that such amounts have been paid."

The Indenture Trustees asserted SLV Claims in Delta's Chapter 11 case, and Verizon asserted TIA Claims. The Bankruptcy Court correctly held that Verizon's TIA claims are barred, and the Order should be affirmed.

## COUNTER-STATEMENT OF ISSUE PRESENTED

Whether Verizon's duplicative TIA Claims are barred by the TIAs and applicable law.

## STANDARD OF APPELLATE REVIEW

Factual findings are reviewed for clear error, and conclusions of law are reviewed *de novo*. FED. R. BANKR. P. 8013; *In re Enron Corp.*, 364 B.R. 482, 485 (S.D.N.Y. 2007).

---

[1]    "**D**" refers to Verizon's Designation of Record; "**CD**" refers to Delta's Counter-Designation.

## STATEMENT OF THE CASE

### A.    The Verizon Transactions

In 1987 and 1988, Delta entered into eight leveraged lease transactions in which Verizon

was the "owner participant."  *See* Substitute TIA/SLV Objection 3 [D 23] (the "**Objection**") at

7-10.  The Owner Trusts are "grantor trusts" whose existence is ignored for tax purposes, so that

Verizon had use of accelerated depreciation and other tax deductions.

Section 15 of the Verizon Leases describes non-exclusive remedies that can be exercised

upon a default.  The Lessor (or Indenture Trustee) has the right under these provisions to recover

SLV.  If other damage recoveries (such as sale proceeds) are not equal to SLV, Delta is liable for

the difference.  *See* Lease for N917DL (Dorchak Decl. [D 27] Ex. A), § 15 and Ex. C.

Delta entered into eight TIAs with Verizon, which apply if Verizon incurs certain tax

losses due to an act or default by Delta.  As noted above, the computation of SLV that is

recoverable upon a Lease default already includes compensation for Verizon's tax losses.  *See,*

*e.g.,* Rutherford Decl., Exhibit 3 to Verizon Response [D 25], at ¶ 8.  The parties' contracts

explicitly address this potential duplication.  First, the TIAs give primacy to the SLV claims by

providing that no indemnity is owed if a tax loss arises as a result of "any event" whereby Delta

"is required to pay Stipulated Loss Value or Termination Value, to the extent that such amounts

have been paid."  *See*  TIA for N917DL (Dorchak Decl. Ex. D), § 7.  Second, the Participation

Agreements provide that if valid TIA claims are paid, SLV must be adjusted.  *See* Participation

Agreement (Dorchak Decl. [D27] Ex. B), § 6(d).

### B.    Decisions on Prior Test Cases

In 2007 the Bankruptcy Court ruled on two "test case" objections to other TIA claims,

and it incorporated those rulings into the January 16, 2008 Decision regarding Verizon's claims

(the **January 16 Decision**").  *See* January 16 Decision [D 34] at 32-33, reported at 381 B.R. 57.

The first test case objection [CD 1] involved TIA claims filed by DFO Partnership ("**DFO**").  The DFO agreements bar TIA claims if a loss arises as a result of any event whereby Delta is "required to pay" SLV.  The second test case objection [CD 2] involved TIA claims filed by Northwestern Mutual Life Insurance Company ("**Northwestern**").  The Northwestern agreements bar TIA claims if Delta "pays" SLV or "an amount determined by reference thereto." *See* May 16, 2007 Decision [D 9] (the "**May 16 Decision**") at 13 (reported at 370 B.R. 552).

DFO and Northwestern agreed that SLV included the amount needed to compensate them for tax losses upon a default.  DFO Response [CD 3] at 9-10; Northwestern Response [CD 7] at 5-6.  However, they argued that their TIA claims should be allowed.

DFO first argued that it never pledged the "tax" portion of SLV; the Bankruptcy Court disagreed, and held that "the entirety of SLV" had been pledged.  May 16 Decision at 10-11. The Court also rejected DFO's contention that the TIA exclusion did not apply unless DFO actually received the "tax portion" of SLV.  *Id*. at 10-11.

DFO further argued that the exclusions in its TIAs should not apply unless Delta actually pays SLV "in cash" and without deductions for other damage recoveries.  DFO Response at 12-13, 15-20.  The Bankruptcy Court held that DFO's position was contrary to the parties' agreements.  May 16 Decision at 10, 12-14; *see also* August 20, 2007 Tr. [CD 24] (the "**August 20 Decision**") at 64; November 6, 2007 Tr. [CD 42]  (the "**November 6 Decision**") at 66-67.

Northwestern argued that its claims should not be barred unless Delta paid SLV in full and in cash.  The Bankruptcy Court held that the TIAs include no such requirements.  The Bankruptcy Court also noted that bankruptcy is one of the events that triggers the SLV payment obligation, so the parties must have anticipated that SLV could be "paid" in the manner permitted by a bankruptcy plan and the Bankruptcy Code.  May 16 Decision at 10, 12-14.

3

Northwestern moved for reconsideration, arguing that the Bankruptcy Court had relied on "bankruptcy policies" to override the TIAs. The court denied the motion, and explained:

> What I said was, or meant to convey in my decision, was that when the parties use the phrase in Paragraph 6(c) [of the TIA], refer to an event whereby the lessee pays stipulated loss value or an amount determined by reference thereto, the parties must have had, in their contemplation, understanding and, therefore, their intent, the self-evident postulate that stipulated loss value might be required to be paid, or an amount determined by reference to stipulated loss value might be required to be paid in the context of bankruptcy. And in that context, it would be perfectly clear to anybody familiar with bankruptcy and presumably, the lawyers and principals who were responsible for this agreement, that the concept of payment in bankruptcy must contemplate the possibility, indeed, the nearly certain probability, that the payment would not be dollar-for-dollar in cash.

> In so ruling, I was not making a ruling that bankruptcy law supervened to govern the term of this agreement that we're concerned with, Section 6(c). Rather, my point was that in construing what the parties contemplated and, therefore, intended in writing Section 6(c) as they did, they must have contemplated the possibility, if not the likelihood, of an obligation to pay SLV in the context of bankruptcy, in which context it would almost certainly be impossible to pay in full, in cash.

July 10, 2007 Tr. [D 16] (the "**July 10 Decision**") at 12-13.[2]

Northwestern and DFO have filed appeals that are pending before this Court.

**C.    The Objection to Verizon's Claims and Verizon's Responses**

The parties agreed that eight of Verizon's TIA claims would be the subject of a third "test case" objection. At a scheduling conference in September 2007, Verizon asked for time to take discovery. When asked, however, Verizon could not identify any contract terms that required discovery, or other issues that called for discovery. September 7, 2007 Tr. [D 22] at 78-82.

Delta filed an objection [D 23], arguing that the Verizon TIA claims were duplicative of SLV claims. Verizon agreed that the SLV computations already included compensation for Verizon's tax losses upon a Lease default; Verizon even referred to the pledged SLV claims as

---

[2]    The Bankruptcy Court held that one Northwestern TIA claim was not barred, because the Court believed that a settlement term sheet did not "refer" to SLV. May 16 Decision at 15. Delta moved for reconsideration, noting that the term sheet did refer to SLV. Motion [D 14] at 3-4. The Bankruptcy Court agreed, and reversed its prior ruling. July 10, 2007 Tr. at 8.

the "primary mechanism" for recovery of such losses.  *See, e.g.,* Rutherford Decl., Exhibit 3 to

Verizon Response [D 25], at ¶ 8.  Nevertheless, Verizon requested allowance of its TIA claims.

First, Verizon argued that Section 7 of the TIAs involved "industry-specific contractual

language" for which extrinsic evidence was necessary to determine whether an ambiguity

existed.  *See* Verizon Response at ¶¶ 1-3, 24-44.  Delta replied that Verizon had never identified

any technical or industry-specific terminology in the agreements.  Delta Reply [D 28] at 5-6.

Second, Verizon argued that the words "to the extent paid" were ambiguous.  Verizon

argued that they should be interpreted as meaning that TIA claims were barred "only" to the

extent that SLV was paid "in full" and in cash.  Verizon Response at ¶ 33.  Delta responded that

the language of the agreements did not support these contentions.  Delta Reply at 7-8.

Third, Verizon argued that the exclusions in Section 7 of the TIAs should only apply if

Delta were to pay SLV in full, in cash and without any deductions for other damage recoveries.

*See* Verizon Response at ¶¶ 33-34, 37, 42-44, 46.  Delta noted that Verizon's contentions were

contrary to the plain language of the contracts.  Delta Reply at 11-12.

In its reply, Delta also pointed to a decision *In re Northwest Airlines Corp.*, Case No. 05-

17930 (Bankr. S.D.N.Y. July 27, 2007) (*see* **Appendix A**), which held that the allowance and

discharge of SLV claims constitutes a "payment" of SLV that bars TIA claims.  *Id*. at 1-4, 12-13.

**D.    Oral Argument Before The Bankruptcy Court**

The Bankruptcy Court heard argument on November 13, 2007 (the "**November 13**

**Hearing**").  Verizon's counsel argued that the word "paid" should be given its "plain meaning":

> MR. PARTEE: Now, Your Honor, the whole concept here of what does "paid" mean,
> I think we've got to think a little bit about it in terms of what is its plain meaning. And
> the simple example that –
>
> THE COURT: You mean, the Black's Law Dictionary?
>
> MR. PARTEE: Well, no. Actually, I want to talk about it just in common parlance.

THE COURT: Plainer than Black's?

MR. PARTEE: Well, I think that a normal dictionary is the first one we would run to. November 13, 2007 Tr. at 51.  The Bankruptcy Court then consulted Webster's New College Dictionary, and noted that one definition of "pay" is "to discharge indebtedness for."  *Id.* at 52.

Verizon also argued on November 13 that its TIA claims are not barred unless Verizon actually receives the "tax" portion of SLV.  *See* November 13, 2007 Tr. [D 33] at 25-26.  Delta replied that the TIA exclusions plainly apply whenever Delta has "paid" SLV, without regard to whether Verizon has received anything.  *Id.* at 27-28, 77-79, 84.

## E.    The January 16 Decision

In the January 16 Decision, the Bankruptcy Court addressed Verizon's claims as well as similar claims raised by AT&T Credit Holdings, Inc. ("**AT&T**").

First, the Bankruptcy Court refused to interpret the TIAs in accordance with the alleged "purposes" of Verizon or Delta, reasoning that the parties had different purposes that in many ways were antithetical to each other.  *See* January 16 Decision at 5-8.  The Bankruptcy Court held that the TIAs must be interpreted in accordance with the words that the parties used, viewed in the factual and legal context in which the agreements were made.  *Id.*

The Bankruptcy Court then rejected Verizon's contention that the TIA claims were only barred if SLV was paid "in full, in cash," holding that Verizon's argument lacked "support in the actual words used by the parties. . . ."  *Id*. at 11.  The Bankruptcy Court held that the words "pay" and "paid" are "words of common usage and meaning" and that "pay" means to satisfy a debt by delivering money or property that is sufficient, in law, to discharge the debt.  *See id.* at 11-13, 18.  It further held that the TIAs prevent duplication by barring TIA Claims so long as Delta has discharged the SLV payment obligations, and Delta has done so.  *See id.* at 16-17.

Finally, the Bankruptcy Court refused to consider extrinsic evidence, noting that Verizon had failed to identify any industry-specific terminology or any custom that gave rise to ambiguity in the TIAs. *Id.* at 26. It also rejected Verizon's contention that TIA claims are not barred unless Verizon receives the "tax" portion of SLV, noting that the exclusion clearly focuses on whether Delta's SLV payment obligations have been discharged, regardless of the recoveries received by Verizon. Finally, the Bankruptcy Court held that the affidavit submitted by Verizon was mere argument and would not have been admissible parol evidence in any event. *See id.* at 11, 28-32.

## ARGUMENT

Verizon admits that SLV includes compensation for the tax losses covered by the TIAs. *See, e.g.*, Rutherford Decl. at ¶¶ 8-9; Verizon Response at 20. The TIAs address this duplication by providing that no TIA Claim exists when Delta also is "required to pay Stipulated Loss Value or Termination Value, to the extent that such amounts have been paid." *See, e.g.,* TIA for N917DL (Dorchak Decl. Ex D), § 7. Under the Bankruptcy Code, the allowance of SLV claims, and the making of distributions in accordance with Delta's plan of reorganization, discharges Delta's SLV obligations. Accordingly, Delta has paid the SLV claims and does not also have to pay the duplicative TIA claims. Verizon's arguments to the contrary are without merit.

## I.    DELTA'S ALLOWANCE AND DISCHARGE OF SLV CLAIMS SATISFIES AND DISCHARGES, IN FULL, DELTA'S OBLIGATION TO PAY SLV

Under bankruptcy law, a "claim" is a "right to payment." *See* 11 U.S.C. § 101(5). Federal bankruptcy law permits Delta to discharge its SLV payment obligations by allowing the SLV Claims and making distributions on them in accordance with the terms of a confirmed plan of reorganization. *See, e.g.,* 11 U.S.C. §§ 524(a), 1141(d). In this case, Delta is delivering property to holders of SLV claims that is sufficient (under applicable bankruptcy law) to discharge Delta's SLV obligations. This constitutes "payment" of the obligations. *See In re*

*Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N. D. Ill. 1999) (self-insured retention was "paid" when a claim was allowed and discharged); *In re Northwest Airlines Corp.*, Case No. 05-17930 (Bankr. S.D.N.Y. July 27, 2007) (SLV "paid" when claim allowed and discharged).

In *Northwest*, the court considered TIAs agreements that excluded tax losses if the lessee has "paid" stipulated loss value. *Id.* at 10. Like Verizon, the owner participant argued that Northwest was not "paying" SLV because, under Northwest's plan, SLV "will not have been paid in full, in cash." *Id.* at 13. The court agreed with Judge Hardin's rulings, and held that the contracts do not require that SLV be paid in full or in cash. *Id.* Judge Gropper noted that the contracts contemplated bankruptcy and therefore must have contemplated "payment" in bankruptcy. *Id.* He also held that the "right to payment" belonged to the Indenture Trustees, as pledgees of SLV Claims, and that the duplicative TIA Claims were barred. *Id.* at 10-13.

Verizon has cited cases holding that a mere "accrual" of an obligation is not a "payment," but that is not the issue.[3] The Bankruptcy Court held that the allowance and "discharge" of the SLV claims – not the mere "accrual" of an obligation – constitutes payment. That holding is consistent with the ordinary definition of "payment." *See Beals v. The Home Ins. Co.,* 36 N.Y. 522, 527 (1867) ("pay" means "discharge a debt"); *In the Matter of Estate of Gray*, 290 N.Y.S. 603, 607 (App. Div. 1936) ("payment" means "discharge").

Verizon asserts – with no support in the record – that the Bankruptcy Court's decision represents "a fundamental break" from past airline bankruptcies. Verizon Br. at 2-3. In fact, Delta's arguments were also made by the debtors in *In re UAL Corp.*, Case No. 02 B 48191

---

[3] *See Scotto v. Brink's, Inc.*, 962 F.2d 225 (2d Cir. 1992) (employer not obligated to provide benefits during period where wages were earned but not paid, as contract required benefits only when wages were paid); *P.G. Lake, Inc. v. Comm'r*, 148 F.2d 898 (5th Cir. 1945) (taxpayer could not claim interest deduction where taxpayer accrued interest but did not transfer it to the lender); *Levine v. Ribicoff*, 201 F.Supp. 692 (S.D.N.Y. 1962) (claimant not eligible for benefits because she had not received wages for six quarters, as required by law).

(Bankr. N.D. Ill. July 26, 2005). *See Debtors' Objection to Claim No. 37718* [Docket No. 12041]. In that case, United's objections were settled prior to the court's ruling. Delta's arguments are also presently being asserted by the debtors in the *Northwest* case.

Verizon also argues that the Bankruptcy Court's ruling would somehow disrupt the law of third party guarantees. *See* Verizon Br. at 20. However, Section 524(e) of the Bankruptcy Code deals with this issue by stating that the discharge of a debtor does *not* affect the liability of a third party guarantor. *See* 11 U.S.C. § 524(e). Accordingly, there is nothing in the Bankruptcy Court's decision that would (or could) interfere with the enforcement of third party guarantees.

The decision in *Union Trust Co. of Rochester v. Willsea*, 9 N.E.2d 820 (N.Y. 1937), makes this clear. In *Union Trust*, a debtor in bankruptcy transferred stock in satisfaction of a debt. The stock did not have value equal to the full nominal amount of the debt. A guarantor argued that the discharge of the debtor constituted "payment" of the obligation and that the payment relieved the guarantor of his obligation. *Id.* at 820. The New York State Court of Appeals did not disagree that the debtor's discharge amounted to a payment. *Id.* However, the court rejected the guarantor's argument because the Bankruptcy Act specifically provided that the discharge of a debtor did not affect the liability of the guarantor. *Id.* at 821.

This appeal does not involve a guaranty by a third party. The TIAs bar claims if Delta has satisfied and discharged Delta's SLV payment obligations, and Delta has done so.

## II.   THE TAX INDEMNITY AGREEMENTS DO NOT REQUIRE THE PAYMENT OF SLV "IN CASH," AND EVEN IF THEY DID SUCH PROVISIONS WOULD BE SUPERSEDED BY FEDERAL BANKRUPTCY LAW

Verizon argues that Section 7 does not apply unless SLV is paid "in full" and "in cash." *See* Verizon Br. at 13-15, 21, 24-25. However, those words do not appear in Section 7 of the TIAs, and Verizon's efforts to add them contradict the contracts as well as bankruptcy law.

9

The concept of "payment" does not require "cash." Black's Law Dictionary defines "payment" as the "performance of an obligation by the delivery of money or some other valuable thing accepted in full or partial discharge of the obligation." BLACK'S LAW DICTIONARY 1165 (8th ed. 2004). Cash is one way to discharge an obligation, but it is not the only way. *Farmers and Citizens Bank v. Sherman*, 33 N.Y. 69, 79 (1865) (rejecting contention that "payment" must be in "cash," and holding that delivery of lumber in discharge of debt was a payment).

In the transactions that are the subject of this appeal, the Operative Documents contemplate many circumstances in which the obligation to pay SLV may be satisfied other than through cash payments. Section 15(c) of each Lease, for example, provides that the "Fair Market Value" of the Aircraft partially satisfies the obligation to pay SLV, regardless of whether a sale occurs. *See, e.g.,* Lease for N917DL (Dorchak Dec. Ex. A), § 15(c). If the Fair Market Value of an Aircraft equals or exceeds the amount specified in the SLV table attached to the Lease, then the SLV obligation is fully satisfied, without any payment of cash at all.

Verizon argues that each TIA requires full payment, in cash, of *indemnities* that are owed under the TIA. *See id.* at 24 (citing TIA for N917DL (Dorchak Decl. Ex. D), § 13). However, this provision just illustrates that the parties knew how to refer to payment "in full and in cash" when intended. Section 7 contains no such requirement; it prevents duplicative claims by barring a TIA claim whenever SLV is "paid," no matter how the payment occurs.

Verizon also argues that Sections 3(d) and 20 of the Leases require certain payments in cash. *See* Verizon Br. at 24. However, Verizon's claims arise under the TIAs, not the Leases. Verizon has not cited a single provision in the TIAs requiring a cash payment of SLV.

More importantly, a creditor's rights under a contract are "subject to any qualifying or contrary provisions of the Bankruptcy Code." *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas*

& *Elec. Co.*, 127 S. Ct. 1199, 1201, 1204-05 (2007) (quoting *Raleigh v. Ill Dep't of Revenue*, 530 U.S. 15, 20 (2000)) (internal quotations omitted).  Federal bankruptcy law permits a debtor to satisfy obligations in accordance with a confirmed plan of reorganization, regardless of whether "cash" payments are specified in a contract.  *See* January 16 Decision at 22; *Ogden v. Saunders*, 25 U.S. 213, 267 (1827) (bankruptcy law may declare that obligations "may be discharged in a way different from that which the parties have provided"); *In re Drexel Burnham Lambert Group*, 138 B.R. 687, 709 (Bankr. S.D.N.Y. 1992); *In re Ames Department Stores, Inc.*, 1995 WL 311764, *2 (S.D.N.Y. May 18, 1995).  A contractual requirement that an obligation be "paid" simply does not mean, in bankruptcy, that a creditor may demand full payment in U.S. dollars.  Instead, payment in "tiny bankruptcy dollars" satisfies claims in bankruptcy cases.  *See, e.g., id.*  at *2 ("[bankruptcy] law allows for compensation only in bankruptcy dollars"); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 893 n.25 (Bankr. S.D.N.Y. 1993) (in most bankruptcy cases, "the pro rata distribution is considerably less than the claim amount."); *In re Drexel Burnham Lambert Group*, 138 B.R. at 709 (bankrupt estates have a right to pay claims in bankruptcy dollars).

The Indenture Trustees cannot ask for cash instead of stock in payment of their SLV claims; bankruptcy law, and the confirmed plan, require them to accept stock (no matter what the contracts say), and the stock constitutes "payment" of the SLV claims as a matter of law.

## III.    THE BANKRUPTCY COURT'S DECISION IS CONSISTENT WITH THE SUPREME COURT DECISION IN *TRAVELERS*

Verizon grossly mischaracterizes the decisions below by contending that the Bankruptcy Court violated rules set forth in the *Travelers* decision.  *See* Verizon Br. at 15-16, 21-22.

In *Travelers*, a surety sought attorneys' fees that were recoverable under the plain language of a contract.  The lower courts held that attorneys' fees should not be awarded for time

11

spent litigating "bankruptcy" issues, based on policies set forth by the Ninth Circuit in its decision in *In re Fobian*, 951 F.2d 1149 (9th Cir. 1991). *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1203 (2007). The Supreme Court reversed. The Supreme Court confirmed that state law contract rights are "subject to any qualifying or contrary provisions of the Bankruptcy Code." *Id.* at 1204-05 (quoting *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (internal quotations omitted). The Court noted, however, that the "Fobian rule" had no textual support in the Bankruptcy Code. As a result, the attorneys' fee claims were not subject to any "contrary provisions" of the Bankruptcy Code, and disallowance could only occur if the claims were barred under state law. *Travelers*, 127 S.Ct at 1204-07.

In this case, the Bankruptcy Court correctly held that the word "pay" should be interpreted in the context of the agreements in which it appears. Bankruptcy was one of the events – if not the main event – under which SLV would be payable, so the parties must have anticipated "payment" in the context of bankruptcy. This holding was based on ordinary rules of contract interpretation, and did not offend *Travelers*. *See* July 10, 2007 Tr. at 12-13.

Similarly, the Bankruptcy Court did not offend *Travelers* when it recognized that the Bankruptcy Code permits Delta to satisfy its payment obligations in the manner set forth in the confirmed plan of reorganization. In this respect the Bankruptcy Code takes priority over any contract terms that might require a different form of payment. *See* cases cited on page 11, above.

Although Verizon purports to find fault with the Bankruptcy Court's use of bankruptcy "policies" to override contract terms, what Verizon is really arguing is that its TIA claims should be considered as if there had never been a bankruptcy filing, and as if the Bankruptcy Code did not provide Delta with a discharge. There is nothing in *Travelers* that supports this contention. The bankruptcy discharge is an incontrovertible fact, and the discharge of Delta's payment

12

obligations constitutes a "payment" by Delta regardless of the court in which the issue arises. If, for example, an SLV claimant were to sue Delta in state court, contending that Delta had not "paid" the SLV claim in full, a state court would be required to give effect to Delta's bankruptcy discharge in the same manner as it was given effect by the Bankruptcy Court. Similarly, if Verizon's TIA claims somehow were being addressed in state court, the arguments about the discharge of Delta's payment obligations would be the same.

In fact, it is Verizon who is trying to use bankruptcy as a way of *increasing* Delta's liabilities. Assume, for example, that the required SLV payment were $100, of which $25 represented the "tax" component. In bankruptcy a "claim" is not supposed to exceed the out-of-bankruptcy "right of payment." *See* 11 U.S.C. §§ 101(5), 502. Accordingly, the bankruptcy "claims" asserted by the Indenture Trustee and by Verizon against Delta should not exceed the $100 SLV Claim – the amount of their collective "right to payment" outside of bankruptcy.

## IV. NO EXTRINSIC EVIDENCE IS NECESSARY OR ADMISSIBLE

The contracts provide that TIA and SLV Claims are mutually exclusive and that Delta does not need to pay both. Delta need only recognize a claim equal to the out-of-bankruptcy "right to payment," and that right to payment belongs to the holders of the SLV Claims. Verizon's arguments about the alleged "purposes" of Section 7, and its suggestions that only one kind of "payment" bars a TIA claim, are contrary to the plain language of the contracts.

### A. Verizon's Argument About The Alleged Purpose Of Section 7 Is Inconsistent With The Plain Language Of The Contracts

Verizon argues that a TIA claim is only barred if Verizon actually receives a portion of SLV sufficient to cover Verizon's tax loss. *See* Verizon Br. at 8-10. As the Bankruptcy Court held, however, "there is no language in Section 7(c) which requires that the payment of SLV be sufficient to pay off the owner participant's tax loss as a condition for the Section 7(c) exclusion

to be applicable." January 16 Decision at 11. Section 7(c) bars a TIA claim if Delta satisfies and discharges Delta's SLV obligations, regardless of whether Verizon receives anything.

Defaults (and foreclosures) can happen outside bankruptcy, too. It was entirely possible that (a) a non-bankruptcy default would occur, (b) Verizon would elect (as it did here) not to exercise its right to repay the debts, and (c) the lenders would foreclose on the pledged collateral and take ownership of the entire SLV claim. If Delta thereafter paid SLV, Verizon's TIA claims would be barred, even though the lenders – as owners of the claim after foreclosure – would receive the entire payment, and Verizon would receive nothing. As the Bankruptcy Court held, the TIAs plainly "prevent double payment by Delta," and Verizon's argument to the contrary "finds no support in, and is refuted by, the provisions themselves." *Id.* at 9, 22-23.

### B.    The Bankruptcy Court Did Not Err By Consulting Dictionary Definitions

Verizon faults the Bankruptcy Court for consulting dictionaries. Verizon Br. at 13-19. However, Verizon's counsel urged the Bankruptcy Court to do so. It was only when counsel did not like the definition that he argued against its use. *See* November 13 2007 Tr. at 51.

In any event, it was perfectly appropriate for the Bankruptcy Court to consult dictionaries. *See* January 16 Decision at 7 (citing *Mazzola v. County of Suffolk*, 533 N.Y.S.2d 297, 297 (App. Div. 1988)); *see also In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 86-87 (Bankr. S.D.N.Y. 2007), *rev'd on other grounds*, 380 B.R. 307 (S.D.N.Y. 2008) ("Courts may refer to the dictionary to determine the plain and ordinary meaning of words under a contract."); *Citadel Equity Fund, Ltd. v. Aquila, Inc.*, 371 F. Supp. 2d 510, 517 (S.D.N.Y. 2005) ("[i]t is appropriate, pursuant to New York contract law, to consult dictionaries and relevant treatises to ascertain the accepted meaning of these terms.") (citing *Mazzola*, 533 N.Y.S.2d at 297; *R/S Assocs. v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 33 (2002) (use of dictionary definition of "effective" in construing the contractual phrase "effective cost of funds")).

14

## C.    The TIAs Plainly Bar Verizon's Claims

Verizon argues on appeal that the word "paid" should be interpreted to include only a payment "in cash," and that other ways of satisfying and discharging the SLV payment obligation should not count.  This argument has no merit.

This is not a case in which a single word can have unrelated meanings, the way a "ball" can refer either to a sphere or a dance.  Verizon Br. at 16-17.  A more appropriate analogy would be a contract that offers a reward to any person who "swims" the English Channel.  Verizon would argue, in effect, that the "swimming" has to take the form of the Australian crawl (because that is the most common swim stroke), and that people who use the backstroke could not earn the prize.  Such a narrow interpretation would be absurd – particularly if the parties negotiated their contract in the context of a federal statute that stated that "a party may discharge any swimming obligation by using a backstroke."

A court will not abandon common-sense interpretation of a contract on the "[m]ere assertion by one [party] that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract . . . ." *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S.2d 174, 176 (App. Div. 1995) (citation and internal quotations omitted).  Highly sophisticated commercial entities and their counsel negotiated these contracts with the understanding that bankruptcy would be one of the events giving rise to a default and giving rise to the SLV payment obligation.  As the Bankruptcy Court held, it is absurd to suggest that the contracts do not apply to the form of "payments" that occur in bankruptcy.

## D.    Section 7 Does Not Use Specialized Industry Terminology

Verizon argues that extrinsic evidence must be consulted whenever a party contends that a contract uses specialized industry terminology.  Verizon Br. at 11-13.  However, the relevant

15

language in the TIAs – providing that a TIA Claim is barred if the lessee is required to pay Stipulated Loss Value or Termination Value, "to the extent that such amounts have been paid" – involves no technical, industry-specific terminology.  *See* January 16 Decision at 26.  The Bankruptcy Court was correct in noting that "[d]espite pages of briefing and two affidavits, the owner participants have not identified a single word in TIA § 7(c) or 6(c) or elsewhere in the Operative Agreements which they claim has arcane or a specialized meaning generally recognized in the airline finance industry, nor have they suggested that there is any custom or practice in the industry which would give rise to any ambiguity in the contract language."  *Id.*

It is particularly odd that Verizon urges the consideration of general industry "customs" when one of Verizon's key arguments to the Bankruptcy Court was that Verizon's TIAs were *different* from other TIAs, and that Verizon's TIA claims therefore should be treated differently. November 13, 2007 Tr. at 23-25; Verizon Response at ¶¶ 22-23 (stressing that the TIAs in TIA/SLV Objections 1 and 2 bar claims when Delta is "required to pay" SLV or when Delta "pays" SLV or "an amount determined by reference thereto").

In any event, the cases cited by Verizon are inapposite.  In the cited cases, the courts found the specific provisions to be facially ambiguous or, in one case, incomplete.  Verizon Br. at 12-13, 18.[4]  In contrast, Section 7 of the TIA is unambiguous, and extrinsic evidence therefore is barred.  *See* January 16 Decision at 30-32.

---

[4]    *See International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86-87 (2d Cir. 2002) (facial ambiguity with respect to title and substance of insurance clause); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094-95 (2d Cir. 1993) (facial ambiguity in conflicting provisions of employment contract); *World Trade Ctr. Props. L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184-85 (2d Cir. 2003), *overruled in part on other grounds sub nom. Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303 (2006) (extrinsic evidence found admissible in order "to determine the parties' intentions with respect to the incomplete and unintegrated terms of a[n insurance] binder") (internal citations omitted); *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins.*

### E.    The Bankruptcy Court Properly Excluded Extrinsic Evidence

It is hornbook law that extrinsic evidence is not proper where the contracts are not ambiguous.  *See Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 654 (App. Div.1983).  The Bankruptcy Court therefore properly excluded Verizon's proffer of extrinsic evidence.  The Bankruptcy Court also correctly held that Verizon's affidavit would not have been admissible as parol evidence.  January 16 Decision at 29-30.   The affidavit was not based on the parties' communications, and the affiant did not participate in the relevant transactions.  The affidavit merely parroted Verizon's arguments about the interpretation of the contract, without even an allegation that Verizon's interpretations had ever been communicated to Delta.  *See* Rutherford Aff. ¶¶ 3-16; Verizon Response at 19-21.  The affidavit would not have been admissible, even if an ambiguity had existed.  January 16 Decision at 29-30; *Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 335 (App. Div. 1981) (subjective "intent" not communicated to the other party is not admissible as evidence); *Zion v. Kurtz*, 405 N.E.2d 681, 687 (N.Y. 1980) (same); *Kates v. Yeshiva University,* 227 N.Y.S.2d 718, 721 (Sup. Ct. 1962) (same).

Verizon contends that the Bankruptcy Court improperly denied discovery.  Verizon Br. at 12-14.  However, the Bankruptcy Court invited Verizon's counsel to identify language that was ambiguous and that required discovery, or to identify other issues to which discovery was appropriate, and Verizon's counsel could not do so.  September 7, 2007 Tr. [D 22] at 78-82.  In addition, Verizon itself argued that the "plain meaning" of the contract could be ascertained by

*Co.*, 472 F.3d 33, 45 (2d Cir. 2006) (the word "contamination" was ambiguous where one interpretation could have negated the insurer's entire obligation); *Alexander & Alexander Servs., Inc. v. Lloyd's*, 136 F.3d 82, 87 (2d Cir. 1998) (party agreed that the word "client" could have multiple meanings); *Garza v. Marine Trans. Lines Inc.*, 861 F.2d 23, 28 (2d Cir. 1988) (the phrase "loss or damage" could have been interpreted differently based on the structure of the contract at issue); *In re Chateaugay Corp.*, 116 B.R. 887, 904 (Bankr. S.D.N.Y. 1990) *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991) *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809 (S.D.N.Y. June 16, 1993)(termination provision of surety bond ambiguous because its activation hinged on compliance with another provision).

consulting a dictionary, as noted above.  The Bankruptcy Court acted appropriately in denying

discovery and in finding that the TIAs should be interpreted in accordance with their plain

language and without resort to extrinsic evidence.

## V.    VERIZON'S ARGUMENT THAT SLV MUST BE PAID WITHOUT OFFSETS FOR OTHER DAMAGE RECOVERIES IS WITHOUT MERIT

Verizon argues, in passing, that Section 7 only applies if Delta "pays" SLV without any

deductions for fair market values or for other damage recoveries.  *See* Verizon Br. at 10, 24.

This argument is without merit.

### A.    Applicable Law Treats Other Damage Recoveries As Payments Of SLV

The Bankruptcy Court correctly held that other recoveries by the Indenture Trustee

(whatever form they take) are "payments" of SLV in that they discharge all or a portion of

Delta's obligations with respect to SLV.  January 16 Decision at 19-20.  It has long been settled

that a lessor *must* treat the proceeds of re-leasing or of sale as credits against liquidated damages,

because otherwise the liquidated damage provisions would operate as unenforceable penalties.

*See Frank Nero Auto Lease, Inc. v. Townsend*, 411 N.E.2d 507, 510-11 (Ohio Ct. App. 1979)

(failure to provide credit for proceeds from new lease rendered damage provision an

unenforceable penalty); *Sw. Park Outpatient Surgery, Ltd. v. Chandler Leasing Div.,* 572 S.W.2d

53, 56-57 (Tex. Civ. App. 1978) (failure to provide a credit for proceeds of a sale or re-leasing

would be an unenforceable penalty); *Siletz Trucking Co. v. Alaska Int'l Trading Co.*, 467 F.2d

961, 963 (9th Cir. 1972) (credit for proceeds, and discounting of future revenues to present value,

are necessary to prevent damage calculation from constituting an unenforceable penalty).  In this

respect, the Leases and the SLV term sheets merely recognize offsets that the law requires.

**B.**      **The Leases Treat FMV And Other Recoveries As "Payments" Of SLV**

The Leases equate the payment of "offsetted" amounts with the "actual payment" of

SLV.  Section 15(c) provides, for example, that the Lessor may demand payment of:

> . . .  any installment of Basic Rent with respect to the Aircraft . . . plus an amount
> equal to the excess, if any, of (i) the Stipulated Loss Value for the Aircraft
> computed as of the date specified in Exhibit C hereto . . . over (ii) the Fair Market
> Value for the Aircraft . . . <u>together with interest, to the extent permitted by
> applicable law, at the Past Due Rate on the amount of such Stipulated Loss Value,
> from the date as of which such Stipulated Loss Value is computed to the date of
> actual payment of such amount</u>;

Lease for N917DL (Dorchak Dec. Ex. A ), § 15(c) (emphasis added); *see also id*. at § 15(d).

The interest calculations run from the date on which "such Stipulated Loss Value is

computed" to the date of "actual payment" of "such amount."  However, the "amount" that is

actually paid under these provisions is SLV *after* deductions for fair market value or sale

proceeds.  These provisions therefore equate the payment of an "offsetted" amount with the

"actual payment" of SLV.  In fact, if Verizon were correct – and if the payment of the "offsetted"

amount did not constitute a payment of SLV – then the interest computations could not be made,

because there never would be an "actual payment" of SLV.

**C.**      **Verizon's Interpretation Would Deprive Section 7 Of The TIA Of Meaning
            And Would Render It A Nullity**

Section 7 of each TIA provides that there is no TIA claim in any event where the Lessee

is required to pay "Termination Value, to the extent that such amounts have been paid."  *See* TIA

for N917DL (Dorchak Dec. Ex. D), § 7(c).  There is only one situation in which "Termination

Value" is paid under the Lease: namely, in the event of an optional termination due to the

obsolescence of the Aircraft.  *See, e.g.,* Lease for N917DL (Dorchak Dec. Ex. A ), § 9.  Section 9

of the Lease provides that in that event the Aircraft should be sold, and the Lessee "<u>shall pay</u> to

Lessor . . . the amount, if any, by which the Termination Value . . . exceeds the sales price" from the sale of the aircraft. *Id.* (emphasis added).

Under Verizon's reasoning, a payment under Section 9 of the Lease would not trigger the exclusion of Section 7, because Section 9 requires the Lessee to pay only the excess of Termination Value over the sales price. Such an interpretation, however, would deprive Section 7 of any meaning insofar as it relates to Termination Value, because Section 9 of the Lease is the only circumstance under which the "Termination Value" concept is invoked.

The same is true with regard to "Stipulated Loss Value." For example, Section 11 of the Lease requires the Lessee to maintain insurance; if an Event of Loss occurs, the insurance proceeds are paid directly to the Owner Participant (or, by virtue of the Indenture, to the Indenture Trustee). The Lease states that these insurance proceeds are then "applied in reduction of Lessee's obligation to pay . . . Stipulated Loss Value" with respect to the Aircraft. *Id.* at 11(a). Therefore, even if an Event of Loss occurs, the Lessee's obligation to pay SLV is offset by a payment from another source.

In every instance in which the Leases refer to "Stipulated Loss Value" and "Termination Value" – whether in the Default provisions, the Event of Loss provisions, the early termination provisions, or otherwise – the Leases provide that the Lessee's obligation to pay SLV or Termination Value is to be offset by other recoveries and payments, either in the form of sale proceeds, fair market value, insurance proceeds or governmental payments. Thus:

- If a default occurs, the Lessor may elect to recover the difference between SLV and the fair market value or actual sale proceeds. *See id.* at § 15.

- If payments are received from governmental authorities, Section 10 of the Lease provides that such payments "shall be paid to Lessor in reduction of Lessee's

obligation to pay such Stipulated Loss Value" or, if Stipulated Loss Value is "already paid by Lessee, shall . . . be applied to reimburse Lessee for its payment of such Stipulated Loss Value." *See id.* at § 10(c)(i).

- If an Event of Loss occurs, as noted above, insurance proceeds are applied "in reduction" of Lessee's obligation to pay SLV. *See id.* at § 11(a).

- If a Termination Event occurs, the Lessee must pay the "excess" of Termination Value over the sale proceeds. *See id.* at § 9.

If Verizon were correct – and if a deduction for other damage recoveries meant that the Lessee does not "pay" SLV or Termination Value – then Section 7 would be deprived of its meaning. No contract should be interpreted in a manner that renders any of its provisions meaningless. *See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) (court must avoid an interpretation "that would leave contractual clauses meaningless"); *Corhill Corp. v. S.D. Plants, Inc.*, 176 N.E.2d 37, 38 (N.Y. 1961) (court should not adopt an interpretation which will leave a provision "without force and effect.").

### D.    Verizon's Interpretation Makes No Sense

Finally, Verizon's interpretation of the contracts simply makes no sense. Assume, for example, that an Indenture Trustee were to sell an aircraft for an amount that exceeds SLV. In that case, the Lessee would not owe any payment under the Leases, and Verizon would receive all payments in excess of the amounts of the outstanding debts, including payment of the portion of SLV that (according to Verizon) provides compensation for Verizon's tax losses. Under Verizon's interpretation of the contracts, however, Verizon could still assert a TIA claim, because SLV would have been recovered from sale proceeds and the Lessee would not have "paid" SLV. Contracts should not be interpreted in a manner that produces such absurd results.

21

*Reape v. New York News, Inc.*, 504 N.Y.S.2d 469 (App. Div. 1986) (rejecting interpretation of newspaper delivery commission that would have led to an absurd result).

## VI.    ALTERNATIVELY, THE ORDER SHOULD BE AFFIRMED BECAUSE THE LAW REQUIRES THE DISALLOWANCE OF DUPLICATIVE CLAIMS, REGARDLESS OF WHAT THE CONTRACTS SAY

The Bankruptcy Court correctly disallowed the TIA Claims based on the plain language of Section 7.  Alternatively, those claims should have been disallowed because they are already encompassed within the SLV Claims, as Verizon has admitted.  *See* Rutherford Decl. at ¶ 8; *see also* Verizon Response at 20.

A claimant often may be entitled to recover for a single injury based on multiple legal theories; yet a loss provides a claimant with only one right of payment, no matter now many separate legal theories the claimant may invoke in support of that right of payment.  *See, e.g.*, *Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("Regardless of whether the harm was the result of negligence or breach of fiduciary duty or a combination of both, there is only a single injury and there may only be a single recovery.") (citation omitted).  This rule applies in bankruptcy cases as well.  For bankruptcy purposes, a "claim" is a "right to payment." 11 U.S.C. § 101(5).  The existence of multiple theories under which recovery may be sought from a debtor does not change the fact that a single loss gives rise to a single right to payment and therefore a single "claim" against the debtor.  *See, e.g.*, *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) ("multiple recoveries for an identical injury are generally disallowed.") (citation omitted).

In *Finley*, the debtor failed to make required pension plan contributions, resulting in an underfunding of its pension plan.  *Id.* at 893.  The pension plan trustee (the "Trustee") and the Pension Benefit Guaranty Corporation (the "PBGC") filed claims against the debtor on different legal theories.  The Bankruptcy Court held that the two claims related to the same "loss" – the

economic effect on the pension plan of the debtor's failure to make required payments – and that two claims could not be allowed for the same loss. *Id*. at 894.

Other cases have also reached the same conclusion. *See, e.g.*, *In re Simetco, Inc.*, No. 93-61772, 1996 WL 651001, at *3 (Bankr. N.D. Ohio Feb. 15, 1996) (disallowing claim to extent it related to the same loss covered by another claim); *In re Chateaugay Corp.*, 115 B.R. 760, 783-84 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991), *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809 (S.D.N.Y. June 16, 1993) (holding claims for unpaid contributions and claims for "plan insufficiency" were duplicative of each other); *In the Matter of Brinke Transp., Inc.*, No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989) (striking claims subsumed in other claims).

In this case, the SLV claims and TIA claims represented two ways of recovering for one tax loss. Verizon assigned the SLV claims to the Indenture Trustees; their rights as secured lenders take priority, and Verizon cannot seek a duplicative TIA recovery for a tax loss claim that has already been allowed and compensated in the form of the SLV claims.

The Bankruptcy Court rejected this general argument and held that parties are free, in theory, to provide for multiple contract recoveries for a single loss. January 16 Decision at 4; May 16 Decision at 6-8. The Bankruptcy Court's decision rested on three errors of law.

First, the Bankruptcy Court incorrectly decided that contract claims should be treated differently from other claims, because other claims involve a right to recover for an injury, while parties are free to contract to pay claims regardless of the actual loss. *Id.* Outside of bankruptcy, however, contract claims must be based on actual losses. A contractual agreement to pay an amount, upon default, that is not based on the other party's actual loss is contrary to public policy and void as a penalty. *See, e.g.*, *In re T.R. Acquisition Corp.*, 309 B.R. 830, 837-38

(S.D.N.Y. 2003) (lease provision calling for double rent if tenant failed to vacate was disproportionate to damages suffered and an unenforceable penalty).  If, as Verizon contends, the Leases and the TIAs required Delta to compensate for the same loss twice, the double payment would be an unenforceable penalty.  *See also* 11 U.S.C. § 502(e) (barring creditor and guarantor from asserting duplicative claims against bankruptcy estate).

Second, the Bankruptcy Court erroneously believed that the TIA and SLV obligations addressed different debts owed to different parties because amounts payable under the Leases are received by the Indenture Trustee (as assignee) while amounts payable under the TIAs are received by Verizon.  *See id.; see also* May 16 Decision at 7-8.  However, the Indenture Trustees are assignees.  Delta entered into the Leases with the Owner Trusts; the Indenture Trustees, as assignees, merely stand in the shoes of the Owner Trustees to collect sums due under the Leases.

As described above, the Owner Trusts are "grantor trusts" that exist solely for the benefit of the Owner Participants.  For tax purposes, the Owner Trustee has no separate existence; the Owner Trustee and Owner Participant are the same entity.  That is the whole reason why compensation for Verizon's potential tax losses is included in the SLV computations.

Third, the Bankruptcy Court did not take account of the multiple liability that would arise if more than one claim were allowed for a single loss.  As noted above, the claims asserted against a debtor in bankruptcy are not supposed to exceed the debtor's out-of-bankruptcy payment obligations.  *See* 11 U.S.C. § 101(5).  If both Verizon and the Indenture Trustees were permitted to assert claims based on the single tax loss suffered by Verizon, that would mean that in bankruptcy Delta's liabilities would exceed its out-of-bankruptcy payment obligations, which is contrary to what Section 101(5) provides.

To the extent that SLV Claims and TIA Claims (which are included in SLV Claims) are designed to provide compensation for the same loss incurred by the same party, they simply represent multiple legal theories upon which the same loss may be recovered.  For bankruptcy purposes, a single loss can give rise to only one "right to payment" and only one claim against the debtor, regardless of how many separate contractual theories of recovery may be asserted.

## CONCLUSION

For all of the foregoing reasons, and those stated in the Bankruptcy Court's January 16 Decision and in the May 16 Decision, the July 10 Decision, the August 20 Decision and the November 6 Decision, Delta submits that the Order should be affirmed.[5]

Dated:  New York, New York
       April 14, 2008

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

/s/ Michael E. Wiles
Michael E. Wiles
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
email: mewiles@debevoise.com
Attorneys for Appellee Delta Air Lines, Inc.

---

[5]  The Bankruptcy Court did not find it necessary to determine whether SLV Claims would have to be reduced if TIA Claims were allowed, because the Bankruptcy Court disallowed the TIA Claims in their entirety.  *See* August 20, 2007 Hearing Tr. at 156-159.  If for any reason the Order were to be reversed, and if TIA Claims were to be allowed, the Bankruptcy Court would need to decide whether SLV Claims need to be reduced.

# APPENDIX A

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3
                                   .  Case No. 05-17930 (ALG)
4    IN RE:                        .
                                   .  (Jointly Administered)
5    NORTHWEST AIRLINES            .
     CORPORATION, et al,           .  New York, New York
6                                  .  Friday, July 27, 2007
                                   .  3:31 p.m.
7                  Debtors.        .
     . . . . . . . . . . . . . ...
8
      TRANSCRIPT OF COURT DECISION ON MOTION TO APPROVE STIPULATION
9                REGARDING "GFCC AIRCRAFT CLAIMS"
                 BEFORE THE HONORABLE ALLAN L. GROPPER
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:  (Via Telephone)

12   For the Debtors:           Mark C. Ellenberg, Esq.
                                Douglas S. Mintz, Esq.
13                              CADWALADER, WICKERSHAM
                                 & TAFT, LLP
14                              1201 F Street N.W.
                                Washington, D.C. 20004
15
     Counsel for General Foods
16   Corporation:               David F. Abbott, Esq.
                                 Kenneth E. Noble, Esq.
17                               David S. Curry, Esq.
                                 MAYER, BROWN, ROWE & MAW, LLP
18                               1675 Broadway
                                 New York, New York 10019
19   (Appearances continued)

20   Audio Operator:            Electronically Recorded
                                by Michelle Brown, ECRO
21
     Transcription Company:     Rand Transcript Service, Inc.
22                              80 Broad Street, Fifth Floor
                                New York, New York 10004
23                              (212) 504-2919
                                www.randtranscript.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.

```
 1   APPEARANCES:

 2   For the Post-Effective Date
     Creditors' Committee:          Lorenzo Marinuzzi, Esq.
 3                                  OTTERBOURG, STEINDLER, HOUSTON
                                      & ROSEN, P.C.
 4                                  230 Park Avenue
                                    New York, New York 10169
 5
     For the U.S. Bank National
 6   Association, as Trustee:       Jeanne P. Darcey, Esq.
                                    EDWARDS, ANGELL, PALMER
 7                                    & DODGE, LLP
                                    111 Huntington Avenue
 8                                  Boston, Massachusetts 02199

 9   For BAE Systems
     Funding, Ltd.:                 Ken Coleman, Esq.
10                                  ALLEN & OVERY, LLP
                                    1221 Avenue of the Americas
11                                  New York, New York 10020

12   For Lehman Brothers:           Shalom L. Kohn, Esq.
                                    SIDLEY AUSTIN, LLP
13                                  One South Dearborn
                                    Chicago, Illinois 60603
14
     For Philip Morris
15   Capital Corporation:           Douglas B. Levene, Esq.
                                    PHILIP MORRIS CAPITAL
16                                    CORPORATION
                                    225 High Ridge Road
17                                  Stamford, Connecticut 06905

18

19

20

21

22

23

24

25
```

3

1    (Proceedings commence at 3:31 p.m.)

2    (Conference call established.)

3         THE COURT:  Good afternoon.  This is Judge Gropper.

4    Who's on the line, please?  May I have appearances?  Let's

5    start with the debtors.

6    (Operator confers.)

7         MR. MINTZ:  Doug Mintz is on from Cadwalader.

8         MR. ELLENBERG:  Your Honor, this is Mark Ellenberg for

9    Cadwalader on the line, too.

10        THE COURT:  All right.  We have the debtors.

11        GFCC?

12        MR. ABBOTT:  Good afternoon, Your Honor.  This is

13   David Abbott from Mayer, Brown, Rowe & Maw, on behalf of GFCC.

14   I have in the room with me Ken Noble, also from Mayer Brown;

15   Dave Curry I believe will be joining us on the call, and Doug

16   Levene who's in-house counsel at GFCC.

17        MR. LEVENE:  Yes, Doug Levene here.

18        THE COURT:  All right.  Good afternoon.

19        MR. ABBOTT:  Good afternoon.

20        THE COURT:  Anyone for BAE?

21        MS. INGMAN:  This is Tania Ingman for BAE.  Ken

22   Coleman is expected to join, also.

23        THE COURT:  All right.  Anyone for the indenture

24   trustee?

25        MS. DARCEY:  Yes.  Good afternoon, Your Honor.  This

1    is Jeanne Darcey from Edwards, Angell, Palmer & Dodge for the

2    trustee.

3         THE COURT:  All right.  Any other counsel who wish to

4    note their appearances?

5         MR. MARINUZZI:  Good afternoon, Your Honor.  Lorenzo

6    Marinuzzi, Otterbourg, Steindler, Houston & Rosen, on behalf of

7    the Post-Effective Date Committee.

8         MR. KOHN:  And Shalom Kohn, Sidley Austin, on behalf

9    of Lehman Brothers, Your Honor.

10        THE COURT:  All right.  Anyone else?

11    (No verbal response.)

12        THE COURT:  Very good.  Well, thank you for joining us

13   this afternoon.  I have written out my decision, and I'll read

14   it into the record as perhaps the fastest way to proceed

15   forward.

16        Who just joined us?

17        MR. CURRY:  David Curry, Mayer Brown.

18        THE COURT:  All right.  Very good.  I've taken

19   appearances, and I have appearances from the principal parties,

20   or from all of the parties.

21        This is a motion by the reorganized debtors for

22   approval of a stipulation that fixes the claims filed by the

23   holders of the debt on ten aircraft that the debtors leased

24   under leveraged lease transactions.  The leases were rejected,

25   and the aircraft were sold at a foreclosure sale at the behest

1  of the lenders, who had a security interest in the aircraft, as

2  well as the leases.  There is no dispute that the sale of the

3  aircraft, together with the proofs of claim given to the

4  lenders hereby, under the stipulation, do not pay the debt in

5  full.

6       The stipulation is supported by U.S. Bank, National

7  Association, as indenture trustee for the holders of the

8  secured debt; by BAE Systems (Funding 1 (Limited) "BAE"), a

9  lender and now the owner of the aircraft by virtue of its

10  credit bid at the foreclosure sale; and by the Post-Effective

11  Date Committee of Creditors.

12       Five of the aircraft included in the original

13  stipulation were not objected to; it was agreed at oral

14  argument that the Court would enter a separate order approving

15  the stipulations with regard to those five aircraft, and that

16  has been done today.

17       Five of the aircraft were the subject of one objection

18  filed by the equity participant in the leveraged lease

19  transactions -- in effect, the beneficial owner through a

20  trustee of the five aircraft before the foreclosure -- General

21  Foods Credit Corporation ("GFCC").  GFCC objects primarily on

22  the ground that the claims provided to the debt impair its

23  rights under a tax indemnity agreement with the debtors that is

24  the subject of its separate proofs of claim filed in these

25  Chapter 11 cases.  The tax indemnity agreement ("TIA") was the

1  same for the five aircraft, and only one such agreement will be

2  dealt with in this decision.

3        The form of aircraft leveraged lease transaction that

4  is at issue herein was described in a recent opinion of Judge

5  Hardin of this Court In Re Delta Air Lines, Inc., 05-B-17923,

6  2007 WL 1462207 (Bankr. S.D.N.Y., May 16, 2007).

7        In light of the fact that that opinion comprehensively

8  analyzes the form of transaction involved, and since all

9  parties here endorse and rely on that opinion, the Court will

10  not repeat all of the background set forth therein.  Suffice it

11  to say that there, as here, the crux of the dispute arose out

12  of the fact that the operative documents gave a claim to the

13  debt for a stipulated loss value of the aircraft under certain

14  circumstances, such as a loss of the aircraft or certain events

15  of default, and stipulated loss value contains a component

16  measured by the tax losses of the equity.  There, as here, the

17  equity owner of the aircraft had a tax indemnity agreement with

18  the lessee airline, indemnifying it for tax losses under

19  certain circumstances.

20        Judge Hardin held that, under the terms of the

21  agreements at issue in Delta, the debt held the claim for the

22  tax loss component embedded in stipulated loss value; and,

23  under the terms of the tax indemnity agreements at issue there,

24  the equity was not entitled to a claim under the tax indemnity

25  agreement.

1    In so holding, Judge Hardin rejected the debtors'

2  argument in <u>Delta</u> that there could not be duplicative claims

3  for tax losses by the debt and by the equity; what he called a

4  "cosmic argument against overlapping claims."  The Court there

5  held that the rights of the parties could only be determined by

6  a careful examination of the agreements that they entered into.

7    No one in this case has relied on the so-called

8  "cosmic argument."  All agree that the dispute should be

9  resolved by careful examination of the applicable agreements.

10  We, accordingly, start with the same proposition that guided

11  the <u>Delta</u> Court:  That the rights of the parties should be

12  determined by a painstaking analysis of the agreements at

13  issue.

14    We start that analysis with several uncontested

15  points.  As noted above, under certain circumstances, the

16  lessee (the airline) may be liable for the stipulated loss

17  value of the plane, an amount calculated by reference to the

18  cost of the aircraft multiplied by a factor set forth on a

19  schedule attached to the lease.  There is no dispute here that

20  stipulated loss value constitutes the basis for calculating the

21  claims that are fixed by the stipulation, and there is no

22  dispute that the claimants are entitled to a claim for at least

23  a portion of the stipulated loss value of the five aircraft.

24    It is also uncontested that stipulated loss value

25  ("SLV" hereafter) contains a component that includes the tax

1  losses that have been or will be suffered by the equity (GFCC)

2  as a result *inter alia* of the defaults under the lease and the

3  subsequent foreclosures.  The crux of the parties' dispute

4  relates to this component of SLV, the portion of stipulated

5  loss value represented by the tax losses, because in Judge

6  Hardin's words:

7          "A component of SLV is an amount designed to

8          compensate for the same tax consequences triggered by

9          an early termination of the leases as that covered by

10         the TIAs."

11         GFCC claims that it, rather than the debt, is entitled

12  to a claim for the tax component of SLV, based on the

13  documents, and that is the crux of its objection.  It starts

14  with the argument that the definition of "stipulated loss

15  value" in the leases, which defines SLV by reference to the

16  cost of the aircraft multiplied by a percentage listed on the

17  applicable exhibit, and then contains an adjustment providing

18  *inter alia* that SLV shall be the amount so determined:

19         "-- as may be adjusted from time to time, as provided

20         in ... Section 7 of the tax indemnity agreement."

21         Section 7 of the tax indemnity agreement -- or TIA --

22  provides for an adjustment to SLV under certain circumstances.

23  It reads as follows:

24         "If any amount is required to be paid by lessee under

25         Section 4 hereof, owner-participant will compute the

1    stipulated loss value percentages and termination

2    value percentages and special purchase price with

3    respect to the aircraft, to reflect such payment in

4    accordance with the manner in which such values were

5    originally computed, or adjusted pursuant to Section 3

6    of the lease, by owner-participant, and shall certify

7    to lessee either that such values as set forth in the

8    lease do not require change or, as the case may be,

9    the new values necessary to reflect the foregoing

10   recomputation, describing in reasonable detail the

11   basis for computing such new values, and upon such

12   certification, such new values shall be substituted

13   for the values appearing in the lease."

14   GFCC's argument in substance is that an amount is

15   "required to be paid" to it under the TIA, that SLV payable

16   under the leases must be adjusted, and the claim provided to

17   the debt is overstated by the unadjusted tax component thereof.

18   The debtors' principal response is that no amount in

19   respect to the tax component is required to be paid to GFCC

20   under the TIA by virtue of an exclusion therein.  That

21   exclusion appears in Section 5 of the TIA, providing that:

22   "Notwithstanding anything to the contrary in this

23   agreement, lessee shall not be required to indemnify

24   owner-participant with respect to a loss or foreign

25   tax credit loss to the extent such loss or foreign tax

1    credit loss occurs as a direct result of one or more

2    of the following events ..."

3    There follow certain events.  The debtors rely in the

4    event in Section 5(c), which is:

5    "Any event as a result of which lessee or any other

6    person has paid stipulated loss value or termination

7    value, or paid the amount required to be the greater

8    of the fair market value of the aircraft and

9    stipulated loss value or termination value in

10    accordance with the provisions of the operative

11    documents, except to the extent that such payment does

12    not reflect the timing of the occurrence for federal

13    income tax purposes;"

14    As all parties agreed at oral argument, the meaning of

15    this section is critical to the resolution of the instant

16    dispute.  GFCC also agreed that the TIA must be read as a

17    whole.  Therefore, if Section 5(c) relieves the debtor from an

18    obligation to indemnify GFCC as owner-participant, then no

19    amount is required to be paid to it in respect of the tax

20    component of the SLV in Section 7 is not applicable.

21    The debtors argue that Section 5(c) governs because

22    the "event" has taken place, as a direct result of which the

23    debtors will have paid stipulated loss value; that is, the

24    debtors' bankruptcy filing and default under the lease.

25    GFCC responds with two points:

1    First, GFCC points to the word "paid" in Section 5(c)

2 and contrasts it to the clause "required to be paid" in Section

3 7, and it contends while Section 5(c) requires actual payment,

4 Section 7 only mandates "required to be paid."  It argues, in

5 effect, that it is "required to be paid" under the TIA because,

6 as of today, the debt has not been "paid."

7    Notwithstanding the difference in wording, Section 5

8 generally applies "notwithstanding anything to the contrary" in

9 the TIA, indicating that Section 5 events must be considered

10 when determining the applicability of Section 7.  The operative

11 event for purposes of Section 5 and Section 5(c), the

12 bankruptcy and default, has already taken place, and SLV will

13 have been paid once the stipulation is approved and payment is

14 made on the relevant proofs of claim.

15    Moreover, the proposition that Section 7 trumps

16 Section 5(c), and that the language in Section 7, "required to

17 be paid," means that an obligation to make a Section 5(c)

18 payment could never be made without first making a required

19 payment under Section 7 stretches the language "required to be

20 paid" beyond the breaking point.  Section 7 does not, for

21 example, provide for an adjustment of SLV when an amount shall

22 first become payable or contain any similar language.  An

23 amount is not "required to be paid" for purposes of Section 7

24 if it is not payable under the TIA, read as a whole, and that

25 includes Section 5(c), which, as noted, applies

1    "notwithstanding anything to the contrary in the agreement."

2         Moreover, it would lead to a result that is at odds

3    with the basic structure of the transaction.  Under the

4    operative documents, stipulated loss value, including the tax

5    component, is part of a package of security assigned to the

6    indenture trustee for the benefit of the debt.  One of the

7    operative documents, the trust indenture and security

8    agreement, contains a waterfall directing payments in respect

9    of the collateral after an event of default.  As should not be

10   surprising, in light of the fact that debt usually comes before

11   equity, the waterfall contains provisions for payments to the

12   debt before payments to the equity.  Payments to the owner-

13   trustee for any tax, expenses, or other losses come forth in

14   line after payment to the debt holders to make them whole.

15   There is no dispute that the claims granted to the debt

16   pursuant to the stipulation, together with the fair market

17   value of the aircraft as per the foreclosure sale, will not

18   make the debt whole.  It cannot be assumed that an amount to be

19   paid to the debt should be reduced on account of a claim by

20   equity, and an intention to do so would have to be clearly

21   expressed in the applicable contracts.

22        GFCC responds that the security granted to the

23   indenture trustee does not include:

24        "All payments required to be made under the tax

25        indemnity agreement by lessee, and all payments of

1    supplemental rent by lessee in respect of any amounts

2    payable under the tax indemnity agreement."

3    See Page 6 of the trustee indenture and security

4    agreement.

5    But this exclusion is only applicable for payments

6    required to be made or amounts payable under the TIA.  As

7    stated earlier, amounts are not payable or required to be paid

8    under the TIA if they are within the exclusion in Section 5(c).

9    GFCC's further argument is that Section 5(c) does not

10   apply because, even after allowance and payment of the proofs

11   of claim, the debt will not have been "paid" SLV because it

12   will not have been paid in full, in cash.

13   Judge Hardin rejected a similar contention in

14   connection with the <u>Delta</u> case.  Although the documents that

15   Judge Hardin dealt with were slightly different from those

16   before this Court, his alternative holding in connection with

17   what he called the "second Delta objection" was that the word

18   "pays" does not mean "paid in cash."  The term instead, in the

19   words of the <u>Delta</u> Court:

20   "-- must be construed in such a manner as to comport

21   with the meaning of payment in the context of

22   bankruptcy, which the parties expressly contemplated

23   in the TIA, as well as in the other agreements.  There

24   is rarely likely to be full payment of claims in

25   bankruptcy; and, in the ordinary course of any Chapter

1        11 case, payment of claims under a plan may be in cash

2            or equity or debt securities of the debtor, or a

3            combination of cash and securities."

4        Judge Hardin went on to contrast the language of the

5    TIA in <u>Delta</u> to the requirement in the lease there that lease

6    payments be made in U.S. Dollars, and he noted that the TIA

7    there could have required payment in cash, but it did not.

8        The TIA here does not require payment in cash.  GFCC

9    attempts to bolster its "paid in full, in cash argument" by

10   reference to a clause in Section 5(c) of the TIA in this case

11   that provides that payment must be made "in accordance with the

12   provisions of the operative documents ..."

13       At the outset, it is not clear that this clause

14   modifies the word "paid."  There is a comma in Section 5(c)

15   setting off the words "paid stipulated loss value or

16   termination value," from the remainder of the section.  The

17   plainest reading of the section is to give effect to the comma

18   and conclude that the words "in accordance with the provisions

19   of the operative documents" do not modify the term "SLV."  See

20   generally <u>In Re Ron Pair Enterprises</u>, 489 U.S. 235, 242 (1989).

21       Beyond this, GFCC's construction misconstrues the

22   words "in accordance with the provisions of the operative

23   documents."  The term "operative documents" is defined in

24   Section 1(j) of the TIA by reference to the definition in the

25   lease, and the lease defines "operative documents" as including

1    at least fifteen separate documents; including the lease, the

2    TIA, and the trust indenture and security agreement.  These

3    documents relied, among many other things, for events of

4    default, foreclosure, and remedies and rights on the part of

5    the debt and the owner-participant.  The operative documents do

6    not require payment in all cases in cash, in full, and the

7    words "in accordance with the provisions of the operative

8    documents" cannot be limited to this meaning.

9         The proofs of claim that have been accorded to BAE and

10   the indenture trustee are "in accordance with the provisions of

11   the operative documents."   The Court, thus, concludes that

12   based on the plain meaning of the parties' agreements, GFCC's

13   objections to the stipulation relating to the remaining five

14   aircraft must be overruled.

15        GFCC further objects to some of the language of the

16   stipulation, and it has suggested some further language.  It

17   objects to Paragraph 2, which provides as follows:

18             "The aggregate amount of the allowed claims was

19             calculated by reference to the stipulated loss value

20             ("SLV") in accordance with each pre-petition lease.

21             Allowance of the allowed claims plus the fair market

22             value with respect to each relevant aircraft

23             constitutes full payment and discharge of stipulated

24             loss value with respect to each pre-petition lease as

25             required pursuant to the relevant pre-petition leases

1      and the other operative documents."

2          The Court finds that this paragraph, settling any

3   possible claims against the debtors from the debt, is

4   consistent with its ruling as set forth above, that SLV does

5   not have to be reduced by virtue of the provisions of Section 7

6   of the TIA and the applicable definition of "SLV" in the lease.

7          GFCC also seeks to add a paragraph that the

8   stipulation shall have no effect whatsoever, whether legal or

9   factual, on GFCC's claims under the TIA; and that all of GFCC's

10  rights and claims against the indenture trustee, BAE, and the

11  other parties to the operative documents and their successors

12  and assigned are fully preserved.  This contention requires

13  consideration of the procedural posture of this matter, and

14  also of the scope of the stipulation.

15         As to the procedural posture, GFCC has filed proofs of

16  claim based on its construction of the TIA, and the debtors

17  have not yet objected to the claim, and their time to do so has

18  not yet elapsed.  It is not appropriate for the debtors to

19  contend that a decision on this motion will invalidate GFCC's

20  proofs of claim.  There may be elements to its claim that do

21  not include those tax losses that are a component of SLV, and

22  thus included in the claims being allowed hereby to others.

23         In any event, while the decision today may be highly

24  persuasive in the future, the Court cannot deal directly with

25  GFCC's proof of claim, and the parties are free to argue as to

1    the effect of this decision on such proof or proofs of claim.

2    The debtors say that they do not want any risk of duplicative

3    liability, but they move for court approval of the stipulation

4    before dealing with the GFCC proofs of claim.  Moreover, the

5    TIA ultimately requires in Section 5(c) that a claim be "paid."

6    Thus, the stipulation should be approved as written with

7    respect to the debtors.

8        With respect to the third parties and GFCC's alleged

9    possible claims against BAE, the indenture trustee, and others,

10   GFCC argues that the Court does not have jurisdiction to bar

11   such claims.  There is nothing in the stipulation that purports

12   to bar any claims or constitute an injunction; and, in view

13   thereof, the provision suggested by GFCC is unnecessary, as

14   well as inappropriate, especially if there were some

15   implication that GFCC might have a claim against any other

16   party to these proceedings for amounts received under the

17   stipulation with the debtors.  The Court cannot conceive on

18   what legal theory there might be such a claim, but will leave

19   the issue to another Court to deal with at another time, if

20   necessary.

21       In sum, the Court will so order the proposed

22   stipulation with regard to the remaining five aircraft, and the

23   debtors should submit an appropriate stipulation for signing.

24       I thank all of the parties for excellent argument and

25   briefs, and I think that concludes the proceedings this

18

1    afternoon.  Thank you very much.

2         COUNSEL:  Thank you for your time.  Thank you.

3         THE COURT:  Good afternoon.

4         COUNSEL:  Thank you.

5         THE COURT:  All right.

6    (Court and court personnel confer.)

7    (Proceedings concluded at 4:02 p.m.)

8                        CERTIFICATION

9         I certify that the foregoing is a correct transcript

10   from the electronic sound recording of the proceedings in the

11   above-entitled matter to the best of my knowledge and ability.

12

13

14
     _____    July 28, 2007
15   Coleen Rand, AAERT Cert. No. 341
     Certified Court Transcriptionist
16   Rand Transcript Service, Inc.

17

18

19

20

21

22

23

24

25